**STATE of Missouri, Respondent,**

v.

**Keith A. SMITH, Appellant.**

**No. 77337.**

Supreme Court of Missouri,
En Banc.

April 29, 1997.

Rehearing Denied May 27, 1997.

904

Laura G. Martin, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Kurt U. Schaeffer, Assistant Attorney General, Jefferson City, for respondent.

WHITE, Judge.

A jury convicted defendant Keith A. Smith of two counts of murder in the first degree. He was sentenced to life imprisonment without parole for the murder of Reverend Parris Campbell and sentenced to death by lethal injection for the murder of Annie Miller. His pro se Rule 29.15 motion for postconviction relief and the amended motion filed by appointed counsel were overruled without an evidentiary hearing. This case is before us on consolidated appeal. This Court has exclusive appellate jurisdiction. *Mo. Const.* art. V, sec. 3. We affirm the conviction, sentence, and denial of postconviction relief.

## I. FACTS

This Court reviews the facts in the light most favorable to the verdict. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993).

Beginning in August 1991, defendant Keith Smith periodically stayed at the home of Reverend Parris Campbell as a guest. Some time between eight o'clock and nine o'clock on the evening of November 17, 1991, Annie Miller, Rev. Campbell's housekeeper, was in the kitchen preparing dinner for Smith and Rev. Campbell. Around this time, Rev. Campbell went downstairs to the family room and began talking to Smith. Smith attacked Rev. Campbell and began choking him with his arm. Smith then grabbed an electrical cord that was lying on a table, wrapped it around Rev. Campbell's neck, and continued to choke him. Smith left Rev. Campbell, went upstairs to the kitchen, found a knife, came back downstairs, and began stabbing him.

At some point, Alphonso Smith (Alphonso), Keith Smith's fifteen-year-old cousin, came to a back door, and Smith let him in. Smith told Alphonso to make sure Rev. Campbell was dead.[1] Smith then went back upstairs to the kitchen and told Annie Miller that Rev. Campbell needed her downstairs. Annie

Miller began down the stairs with Smith behind her. Smith grabbed her by her neck and began to choke her. He then wrapped an electrical cord around her neck and continued to choke her until she fell to the floor. Smith went back upstairs to the kitchen, grabbed a knife, and returned downstairs. Then he went upstairs again, this time grabbed a pair of scissors, went back downstairs, and began stabbing her with the scissors.

Smith dragged the bodies into the garage, where Rev. Campbell kept two cars. Smith put both of the bodies into the trunk of one car. In the other car, Smith put his belongings, along with Rev. Campbell's checkbook, credit cards, cash, gold jewelry, gun, and stereo speakers. Smith and Alphonso fled in this car and picked up Smith's girlfriend, Sylvia Ware. Smith told Ware of the killings in detail.

On November 23, 1991, the police discovered the bodies of Rev. Campbell and Annie Miller in the trunk of the car parked in Rev. Campbell's garage. Three pieces of electrical cord were also found in the trunk, including one still wrapped around Annie Miller's neck. Rev. Campbell died from asphyxia due to strangulation. He was stabbed before and after death. Annie Miller also died from asphyxia due to strangulation, to which stab wounds contributed considerably. Smith was arrested on November 24, 1991, and confessed to the murders. At his arraignment, however, Smith pleaded not guilty.

For the death of Rev. Parris Campbell, the jury found Smith guilty of murder in the first degree and recommended a sentence of life imprisonment without parole. For the death of Annie Miller, the jury found Smith guilty of murder in the first degree, but could not agree on the appropriate penalty. The court sentenced Smith to life imprisonment without parole for the murder of Rev. Campbell and sentenced Smith to death by lethal injection for the murder of Annie Miller.

Smith filed a pro se Rule 29.15 motion and, through appointed counsel, an amended Rule

1. Alphonso Smith was originally charged as a codefendant. He entered a plea of guilty during Smith's trial. The record does not state the terms of the plea or the sentence that Alphonso received.

29.15 motion. The motions were overruled without an evidentiary hearing. This consolidated appeal follows.

## II. MOTION TO SUPPRESS

Smith claims that the trial court erred in overruling his motion to suppress the videotaped statement that he gave to Detective John Fraise at the police station following his arrest. A trial court's ruling on a motion to suppress will not be upset on review if it is supported by substantial evidence. *State v. Feltrop*, 803 S.W.2d 1, 12 (Mo. banc 1991).

Smith's motion to suppress alleged that his statement was not voluntary as he gave the statement while under the influence of cocaine and marijuana. In support, he offered the results of a blood test taken twenty to twenty-four hours after the statement. The test showed positive results for cocaine and marijuana metabolites.[2] Smith's amended motion additionally alleged that once taken into custody he was not adequately advised of his rights. He also claimed that he was coerced into the statement by a promise of leniency.

Once the admissibility of a statement has been challenged, the State has the burden of proof to demonstrate by a preponderance of the evidence that the statement was voluntary. *Id.* The proper focus of such a challenge is whether coercive police activity occurred. *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S.Ct. 515, 523–24, 93 L.Ed.2d 473 (1986). The evidence presented on a motion to suppress is reviewed in the light most favorable to the ruling. *State v. Bittick*, 806 S.W.2d 652, 654 (Mo. banc 1991).

At the hearing on the motion to suppress, Det. Fraise testified that he witnessed Smith read his *Miranda*[3] waiver form out loud and sign it. This form, bearing the signatures of both Smith and Det. Fraise, was introduced into evidence. Det. Fraise stated that Smith,

after signing the form, indicated that he was willing to talk to him. Det. Fraise questioned Smith for two hours and found him to be alert, speaking coherently and in detail. At some point during this two hour period,[4] Smith said to Det. Fraise, "I'm going to get the chair for this," to which Det. Fraise responded, "No, you're not, because they don't do that in this state." Det. Fraise advised Smith of his rights again and then videotaped Smith's statement. The following is an excerpt from the end of the statement:

Fraise: Has anything been promised to you in return for this statement, Keith?

Smith: What do you mean?

Fraise: Just that. Have we promised anything in return for this statement?

Smith: Were you all supposed to?

Fraise: I'm sorry.

Smith: Were you all supposed to?

Fraise: Well, I don't think so. I mean, the question is this, did you, did we promise you anything in return for this statement?

Smith: You said I wouldn't get the chair.

Fraise: No, that's not what was said.

Smith: What.

Fraise: That's not what was said.

Smith: Well, anything else beside that, no.

Fraise: Now that you bring that up, in your opinion, or at least in your mind, what was said about "the chair?"

Smith: I might not, I wouldn't get it if I do right.

Fraise: Are you sure that [sic] what was said?

Smith: I don't know how to put it, I don't know, it was like, the way you said it, it was like you know I ain't gonna get it, if I ... I don't know, you said I don't remember, I couldn't remember, I just forget.

Smith's motion claimed that he was under the influence of cocaine and marijuana to the

---

**2.** "[A] metabolic waste usu.[ally] more or less toxic to the organism producing it: EXCRETION." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1419 (1981).

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** Det. Fraise testified from memory as he could not produce any notes from the initial two-hour period of questioning during which the alleged coercion took place.

point of delusion when Det. Fraise stated "they don't do that in this state." Smith maintains that due to his impaired condition, Det. Fraise's comment amounted to coercion as Smith interpreted the statement as a guarantee that he could never receive the death penalty. Smith argued that it was because of this "promise" that he waived his *Miranda* rights and agreed to make a statement.

In support of his allegedly delusional condition, Smith offered the drug test and pointed to the confession itself, in which he made repeated references to "Chucky." "Chucky" is the name of a doll that comes to life and kills people in the "Child's Play" movies. As Smith described the events that took place on November 17, 1991, he at times spoke in the first person, at other times he related events as though he witnessed "Chucky" perform them, and at still other points of Smith's confession he claimed that he was acting in accordance with "Chucky's" demands. The following conversation took place when Det. Fraise asked Smith what "Chucky" meant to him:

> Smith: It's a guy I invented. I invented all the Chucky's, one and two and I'm making another one, so it's three that's out now.
>
> Fraise: So, this'll be Chucky Three?
>
> Smith: Yeah, but, I'm the original.
>
> Fraise: You're the original Chucky. And you say you invented this Chucky for what reason?
>
> Smith: Because, I wanted to make TV.
>
> Fraise: What do you mean by that?
>
> Smith: Wanted to make TV. I wanted to make, you know, movies, make it in the movies. And you make it, he's selling it. TV's, Child's Play, the little doll. My little cousin's name is Chucky. I gave him that name. 'Cause I like Chucky.'
>
> Fraise: You like what you see what Chucky does?
>
> Smith: I like Chucky do what he do.
>
> . . .
>
> Smith: . . . And I don't believe there's no Chucky, so I don't know why I keep saying there's a Chucky, but . . .

> Fraise: I don't either, so let's quit saying that.
>
> Smith: I can't . . .
>
> Fraise: Let's stick to reality here, of what we're talking about.
>
> Smith: I mean . . . I know.
>
> . . .
>
> Fraise: Would you agree . . . and look at me Keith, would you agree that Chucky is a figment of your imagination?
>
> Smith: I hate to say it, but yes.
>
> Fraise: So that, when you're really talking about the events that occurred inside this house, and when you left this house, you're really talking about you?
>
> Smith: Yes.
>
> . . .
>
> Smith: I just can't believe it, I just snapped. And I didn't do it, Chucky did it. I don't know why I keep saying that, but I didn't do it.

■ A deficient mental condition, whether it is manifested by delusional behavior or a positive drug test, does not by itself render a statement coerced or involuntary. *Connelly*, 479 U.S. at 164, 107 S.Ct. at 520. *See State v. Wise*, 879 S.W.2d 494, 525 n. 3 (Mo. banc 1994). Although the mental state of the defendant is a factor to consider in the evaluation of police conduct, a defendant does not have the constitutional right "to confess to his crime only when totally rational and properly motivated." *Connelly*, 479 U.S. at 164, 166, 107 S.Ct. at 520, 521.

■ As to his claim of coercion, Smith's motion correctly asserted that a confession extracted by an implied promise of leniency is not admissible. *State v. Schnick*, 819 S.W.2d 330, 336 (Mo. banc 1991). It is also true, however, that a noncommittal statement by the police that is twisted into a promise in the mind of the defendant does not rise to the level of an implied promise. *Id.*

Det. Fraise testified that, in his opinion, Smith did not appear to be under the influence of drugs, Smith was alert and comprehended what was happening, Smith gave consistent and detailed versions of the events in question, and Smith was consciously and purposely using the name "Chucky" in reference

to his own actions. Det. Fraise's statement that "the chair" is not used in Missouri was, and is, a true statement. *Section 546.720 RSMo* (1994).[5]

After viewing the videotape, the trial court found that the State had met its burden of proving by a preponderance of the evidence that Smith's statement was voluntary. The court went on to specifically find that the statement "was not produced as a result of threats or promises." This finding is supported by substantial evidence.

Smith also challenges the admission of his confession into evidence during the guilt phase of his trial. We review the admission of evidence for the abuse of discretion. *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc 1992). Smith objected to the admission of the confession at trial on the same grounds as at his motion to suppress—that the statement was not voluntary because he was under the influence of drugs and because Det. Fraise made him a promise of leniency. Admitting Smith's confession over these repeated objections was not an abuse of discretion.

### III. VOIR DIRE

#### A. Venireperson Maggie Lenley

■ Smith contends that the trial court erred in overruling his timely *Batson*[6] challenge against the State's use of a peremptory strike against Maggie Lenley. Lenley was one of three African–Americans on a thirty-member venirepanel. The other two African–American venirepersons were selected to serve on the jury. A finding that a peremptory strike was properly used will not be overturned absent clear error. *State v. Gray*, 887 S.W.2d 369, 384 (Mo. banc 1994). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left

with the definite and firm conviction that a mistake has been committed." *State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987).

■ In response to a *Batson* challenge, the State must present a reasonably specific and clear, racially-neutral explanation for the strike. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). Once a prosecutor articulates an acceptable reason for a strike, the burden shifts to the defendant to demonstrate that the strike was nonetheless racially motivated. *Id.* The prosecutor offered three factors on which he based his peremptory strike. The trial court found all three factors to be valid and found that Smith did not meet his burden in proving that the factors were pretextual notwithstanding their facial validity. Although each proffered reason could by itself wholly defeat a *Batson* challenge, all three will be addressed.

■ Maggie Lenley, 21, was the youngest person on the panel. The prosecutor stated that it was "the State's belief that younger jurors are less likely statistically to vote in favor of the death penalty." Smith's counsel countered by asserting that, as far as he knew, the State did not routinely strike twenty-one-year-old venirepersons in death penalty cases solely because of their age. Although the prosecutor never claimed that Lenley was struck solely because of her age, age is a proper factor for a prosecutor to consider. *Antwine*, 743 S.W.2d at 64. Further, even if the prosecutor's perception of the venireperson is based on past experience, "hunches," or "horse sense," the perception can survive *Batson* if it is based on a racially-neutral factor. *State v. Kempker*, 824 S.W.2d 909, 911 (Mo. banc 1992). Age is a racially-neutral factor, and therefore, a proper factor on which to base a "hunch."

■ The second factor that the prosecutor offered as a basis for the strike was the

---

5. "The manner of inflicting the punishment of death shall be by the administration of lethal gas or by means of the administration of lethal injection." *Section 546.720.* All statutory references are to RSMo 1994 unless otherwise indicated.

6. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Although *Batson* has been extended to include gender-based peremptory strikes, Smith's brief confines his chal-

lenge to race. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 127–29, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994). This opinion does not address the applicability of *Batson* to age-based peremptory strikes, as references to age in the briefs of both parties address whether or not Maggie Lenley's age was a pretextual justification for a *racially*-motivated strike.

possibility that Maggie Lenley knew three of the State's potential witnesses, including Alphonso Smith, the codefendant. Lenley, 21, had attended the same high school as the witnesses, who ranged in age from 19—21. Lenley stated during voir dire that she did not recognize the names of the witnesses. Smith's counsel argued that the State, by basing its strike on this factor, was making the assumption that if Lenley served on the jury, she would recognize the faces of the witnesses once the trial began. He contended that such an assumption was improper as there had been no proof that such an event would occur. The prosecutor did not have to prove that Lenley would recognize the witnesses on sight before he used a peremptory strike against her. *See Antwine,* 743 S.W.2d at 64. Again, hunches are legitimate justifications for peremptory strikes. *Id.* Moreover, the justification for a peremptory strike need not rise to the level of a justification for a challenge for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.

■ The third reason that the prosecutor offered was that he felt Maggie Lenley's responses were weak during the death-qualification voir dire. He emphasized her reluctance to impose the death penalty unless it was an "extreme" case—she specifically mentioned "child murders"—and her response that she would not like to sign her name to a death verdict. Smith's counsel pointed to the fact that the prosecutor did not strike Elfriede Marley, a white venireperson who also had responded that she felt the death penalty was appropriate in "extreme" cases. Marley, however, did not qualify her answer by using "child murders" as an example of an extreme case and did not waver on her ability to sign a death verdict. The prosecutor stated that he also took into consideration the additional thirty years of life experience that Marley, 51, had compared to Lenley, 21. Further, the prosecutor stated that he fully expected Smith's counsel to use a peremptory strike against Marley as Smith's counsel had unsuccessfully challenged Marley for cause because she seemed preoccupied about training that she was missing for a new job after being unemployed for eighteen months. Elfriede Marley was not a white venireperson "similarly situated" to Maggie Lenley.

■ On a *Batson* challenge, the trial court must determine from the totality of the circumstances whether the prosecutor's explanations are merely excuses for improper discrimination. *Parker,* 836 S.W.2d at 934. We find that the trial court did not clearly err in finding the prosecutor's justifications to be plausible and in finding that Smith did not meet his burden in proving that those justifications masked any racial motivation for striking Maggie Lenley from the venirepanel.

**B. Venireperson Christopher Raper**

■ Smith alleged in his motion for new trial that the trial court erred in sustaining the State's challenge for cause against Christopher Raper based on his answers during the death-qualification voir dire. Smith appeals the rejection of this claim. A venireperson is properly excluded for cause if his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). A trial court's ruling on the qualifications of a prospective juror will not be disturbed on appeal unless it is against the evidence and constitutes an abuse of discretion. *See State v. Kreutzer,* 928 S.W.2d 854, 866 (Mo. banc 1996).

During death-qualification, Raper expressed reservations about the death penalty in response to the initial, general questions asked of the six-member panel. Later, the prosecutor asked Raper specifically if he could impose the death penalty in an appropriate case, and Raper responded, "Yes. I'm straddling the fence." Then the following exchange took place:

MR. BUSHUR [the prosecutor]: Again, let's go through it a step at a time, if we can, to find out exactly what you're feeling.

VENIREPERSON RAPER: I could listen to the case but when it come [sic] down to deciding his life or not, I don't think I could do it. It's a hard decision to make.

MR. BUSHUR: That's because of your feelings about the death penalty, not having heard any evidence in the case—

VENIREPERSON RAPER: Just my feeling about taking someone's life. I don't know.

MR. BUSHUR: It is true that you could not vote for the death penalty in a case, in a murder one case?

VENIREPERSON RAPER: Probably not.

MR. BUSHUR: ... Would you find yourself—that you would have to automatically vote for life without parole in a murder first degree case to avoid feeling that you may be doing the wrong thing?

VENIREPERSON RAPER: Yes.

MR. BUSHUR: So would you always vote for life without parole?

VENIREPERSON RAPER: More than likely in most cases, yes.

Later, Raper said he could give the death penalty serious consideration and could follow instructions if selected as the foreperson, but he would not want the responsibility of standing up and reading the verdict. Raper's one response that he would seriously consider the death penalty is not dispositive of his qualifications to serve as a juror. *State v. Smith,* 649 S.W.2d 417, 425–26 (Mo. banc 1983). Considering the entirety of Raper's examination, the trial court did not abuse its discretion in finding that his views on the death penalty would substantially impair the performance of his duty as a juror in a first-degree murder trial.

### C. Venireperson Vicki Atterbury

■ Smith's motion for new trial also contested the ruling of the trial court sustaining the State's challenge for cause against Vicki Atterbury. The claim was denied and Smith appeals. The State's challenge was again based on death-qualification responses. Atterbury's initial response was that she did not know if she could ever impose the sentence of death. She went on to say that the death penalty may be appropriate "[f]or someone like Jeffrey Dalmer [sic]...." At-

terbury also said that she would hold the State to a higher burden of proof in a case that could result in the death penalty than in a case that could not. Although at one point, Atterbury said she would follow the court's instructions, she then admitted again that the fact that the death penalty was a possible sentence in the case could affect her impartiality. The court noted for the record that she was emotional throughout the questioning. The trial court has the best vantage point from which to evaluate a venireperson's commitment to follow its instructions. *State v. Leisure,* 749 S.W.2d 366, 375 (Mo. banc 1988). There is no evidence that the court abused its discretion in sustaining the State's challenge for cause as to Vicki Atterbury. This point is denied.

### IV. GUILT PHASE

#### A. Admission of Photographs

■ Smith asserts that it was an abuse of discretion to admit into evidence, over his objection, the photographs marked Exhibits 34, 37, 38, and 60–63. He alleges that the photographs were extremely gruesome and inflammatory, and that their prejudicial effect on the jury outweighed any probative value. The admission of photographs into evidence is within the discretion of the trial court. *State v. Feltrop,* 803 S.W.2d 1, 10 (Mo. banc 1991).

■ Smith concedes that, of the photographs that he is contesting, the jury actually viewed only Exhibits 60 and 63.[7] Exhibit 60 was used to show the jury Annie Miller's stab wounds. The pathologist used Exhibit 63 to explain to the jury how the electrical cord around Annie Miller's neck contributed to her death. Even though gruesome, autopsy photographs are admissible to show the nature and location of wounds, and to aid the jury in understanding the testimony of the pathologist. *Id.* at 11. We find that the trial court did not

7. The trial court specifically instructed that Exhibits 34 and 37 were not to be shown to the jury. Upon review of the record, it appears that Smith never specifically objected to Exhibit 38, that the picture was not referred to during testimony, and that the picture was never shown to the jury. The pathologist testified from Exhibits 60–63, but only Exhibit 60 and Exhibit 63 were actually shown to the jury. After retiring for deliberation, the jury requested to view all of the evidence. By agreement, Exhibits 34, 37, 38, 61, and 62 were not sent to the jury.

abuse its discretion in admitting the photographs.

 Smith's objection to Exhibits 34, 37, 38,[8] 61, and 62[9] is that they were *constructively* viewed by the jury through the testimony of police detectives and the pathologist. Review of the record reveals that Exhibits 38, 61, and 62 were admitted into evidence with other photographs, but were never specifically referred to by any witness or viewed, constructively or otherwise, by the jury. We narrow our focus, therefore, to Exhibits 34 and 37. These two photographs were referred to during the testimony of a police detective who was present when the bodies were discovered. He used the pictures to describe the condition and location of Annie Miller's body. The type of wounds that the victim suffered and the appearance of the crime scene are relevant to a first-degree murder charge. *State v. Storey,* 901 S.W.2d 886, 895 (Mo. banc 1995). We find that the trial court did not abuse its discretion in admitting the detective's testimony.

**B. Admission of Pathologist's Testimony**

 Smith contends that the trial court erred in admitting the testimony of the pathologist, Dr. Brij M. Mitruka, as to the cause and manner of the deaths of Rev. Campbell and Annie Miller. As Smith did not object at trial, this point is reviewed for plain error. To receive plain error relief, the appellant must demonstrate that "the action of the trial court was not only erroneous, but that the error so substantially impacted upon his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected." *State v. Hornbuckle,* 769 S.W.2d 89, 92–93 (Mo. banc 1989).

The basis for Smith's argument is that Dr. Mitruka was not the forensic pathologist who actually performed the autopsies. The autopsies were performed by Dr. Shelley Tepper, another forensic pathologist who, at the time of trial, no longer worked for Jackson County. Smith argues that, since Dr. Mitru-

ka's testimony was based on Dr. Tepper's report, Dr. Mitruka's testimony was hearsay, requiring reversal under *State v. Johnson,* 504 S.W.2d 334 (Mo.App.1973).

*Johnson* involved an appeal from a conviction of murder in the second degree. The doctor who testified at trial as to the cause of the death of the victim stated that he had participated in the autopsy. On direct examination, the prosecutor asked, "Now doctor, based on what you found in this particular autopsy, are you prepared to give with reasonable medical certainty the cause of this man's death?" The doctor answered affirmatively and without qualification. *Id.* at 335. On cross-examination it was revealed that he did not actually perform the autopsy, though he was present during the procedure and witnessed it. He admitted that on direct examination he had been merely reciting from the report of the doctor who had conducted the autopsy. When pressed as to his qualifications, the testifying doctor could not produce *any* autopsy report from his office that showed that he himself had ever conducted an autopsy. The court of appeals held that the cross-examination demonstrated that the testifying doctor's opinion had no probative value and remanded the case for a new trial. The opinion also stated that the State should have qualified the autopsy report under the business record hearsay exception if it wanted to introduce testimony about the report. *Id.* at 335–37.

*Johnson* is distinguishable from the case before us. At Smith's trial, the prosecutor questioned Dr. Mitruka thoroughly as to his qualifications. Dr. Mitruka had been a practicing forensic pathologist for six years and had determined the cause of death in over a thousand autopsies. On direct examination, Dr. Mitruka expressly stated that he did not perform the autopsy and that his opinion was based on his independent review of the autopsy files and the police photographs. The autopsy report itself was not introduced into evidence, but it appears from the record that

---

**8.** Exhibits 34, 37, and 38 are photographs of Annie Miller's body taken by police detectives at the crime scene.

**9.** Exhibits 61 and 62 are photographs of Annie Miller's body taken by police detectives in the morgue before the autopsy.

the parties stipulated to the report.[10] There was no need, therefore, for the report to be additionally qualified under the business record hearsay exception. Dr. Mitruka testified that his opinion, independent of Dr. Tepper's conclusions, was that Rev. Campbell and Annie Miller died as a result of strangulation. Smith never challenged Dr. Mitruka's qualifications or objected to his testimony. Smith fails to demonstrate how he suffered any manifest injustice by the trial court admitting this evidence. This point is denied.

■■■ Smith also appeals from the denial of an evidentiary hearing on his Rule 29.15 claim based on his counsel's failure to object. We review the court's findings and rulings on a Rule 29.15 motion for clear error. *Rule 29.15(j)* (1994).[11] To receive an evidentiary hearing, a movant must allege facts, which if true, demonstrate that he is entitled to relief. *State v. Blankenship,* 830 S.W.2d 1, 16 (Mo. banc 1992). Smith's claim is conclusory and fails to allege that this objection would have been sustained had it been raised. *See infra* part VII. Moreover, it appears from the record that Smith stipulated to what Dr. Tepper's testimony would have been concerning the cause of the deaths. As Dr. Mitruka's conclusions were identical to those of Dr. Tepper, we find no clear error.

### C. Burden of Proof

■■■ Smith's motion for judgment of acquittal at the close of the State's evidence maintained that the State did not prove beyond a reasonable doubt: (1) the element of deliberation, or (2) that he caused the deaths "by stabbing" as the indictment alleges. This claim was rejected and Smith now appeals. Since Smith went on to present evidence in his own defense after the State rested, however, he has waived this claim. *State v. White,* 798 S.W.2d 694, 696 (Mo. banc 1990).

■■■ Smith repeated the same arguments at the motion for judgment of acquittal that he made at the close of all evidence. He now appeals the denial of that motion. On a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there was "sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Purlee,* 839 S.W.2d 584, 587 (Mo. banc 1992). The evidence and all reasonable inferences therefrom are reviewed in the light most favorable to the jury's verdict and any contrary evidence and inferences are discounted. *Id.*

### 1. Deliberation

■■■ Deliberation means "cool reflection for any length of time no matter how brief." *Section 565.002(3).* The forensic pathologist testified that both Rev. Campbell and Annie Miller died from asphyxia. He stated that a death caused by asphyxia is not instant, a person usually becomes unconscious after being choked for twenty to thirty seconds. The jury heard that after two to three minutes of strangulation, death occurs because the brain cannot function without oxygen. The jury also heard Smith admit in his confession that he began choking Rev. Campbell with his arm, then found an electrical cord and continued choking him, and then found a knife and stabbed him. A reasonable juror could have found that Smith deliberated upon the matter before he caused Rev. Campbell's death.

■■■ As to the death of Annie Miller, the jury heard Smith state in his confession that he did not want anyone to know what he had done to Rev. Campbell. He went upstairs to the kitchen and told Miller that Rev. Campbell needed her downstairs. When she asked what Rev. Campbell wanted, Smith said at first that he did not know, then that Rev. Campbell wanted her to do something for him, then that he wanted her to see something. Miller began down the stairs with

---

10. During direct examination of Dr. Mitruka, the prosecutor referred to the autopsy report on Rev. Campbell "that the parties have stipulated to." Smith made no objection. On Smith's motion for acquittal at the close of the State's evidence, the prosecutor stated "I believe we discussed the possibility of stipulating to Dr. Tepper's testimony, *in fact had agreed to stipulate,* and entered into the testimony, medical testimony, pursuant to agreement between counsel." (emphasis added). Smith's counsel did not refute this statement.

11. Smith was sentenced on September 16, 1994.

Smith behind her. She stopped short upon seeing Rev. Campbell's body. Smith then grabbed Miller by her neck and choked her with his arm until her dentures were forced from her mouth. Smith stated that when Miller had almost passed out, he found an extension cord and continued to choke her. After he stopped, Smith made two trips upstairs before returning to stab Miller with the scissors that he had found. A reasonable juror could have found that Smith deliberated upon the matter before he caused Annie Miller's death.

### 2. Cause of Death

■ Smith never attacked the sufficiency of the indictment. His argument was that the State did not prove the cause of deaths alleged in the indictment beyond a reasonable doubt. Section 545.030 states in pertinent part:

> No indictment or information shall be deemed invalid, *nor shall the trial, judgment or other proceedings thereon be ... in any manner affected:*
>
> . . .
>
> (14) For any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged; nor
>
> . . .
>
> (18) For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits.

(emphasis added). "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." *Section 565.020.1.* The exact nature of the mortal wound is not an element of the crime. Any description that does appear in the indictment is, therefore, surplusage and cannot affect the outcome of the trial. *Section 545.030.* Moreover, the jury instructions referred to the cause of Rev. Campbell's death as "by strangling" and to the cause of Annie Miller's death as "by strangling and stabbing." In light of Smith's confession and the testimony of the forensic pathologist, a reasonable juror could have found that Smith caused the deaths in the manner stated in

the instructions. Therefore, Smith suffered no prejudice by the wording of the indictment. This point is denied.

### D. Motion for Mistrial

■ After the State rested, Smith moved for a mistrial, alleging that he had been seen in shackles by members of the jury. Smith claimed that while he was waiting to be transported back to prison at the end of the day, he could see jurors through a glass door. Smith also believed that two jurors were able to make eye contact with him while they were walking to their transport van. The jury room clerk was called and testified that to his knowledge the jurors had not seen the defendant. Smith appeals the denial of this motion.

■ Granting a mistrial is a drastic remedy that should be used only when necessary to cure grievous prejudice. *State v. Beal,* 470 S.W.2d 509, 516 (Mo. banc 1971). The decision to overrule a motion for mistrial will not be overturned absent a finding that the trial court abused its discretion. *Id.* Smith did not prove that any juror saw him at all outside of the court room, much less that jurors saw him, took notice of his shackles, and that the sight grievously prejudiced him. Proof is required. *Id.* The trial court did not abuse its discretion.

### E. Closing Argument

■ Smith contends that the trial court plainly erred by not declaring a mistrial *sua sponte* due to prosecutorial misconduct during closing argument. A conviction will be reversed for improper comments during argument only if it is established that the comments had a decisive effect on the outcome of the trial. *State v. Newlon,* 627 S.W.2d 606, 616 (Mo. banc 1982). Argument is proper if it can be reasonably inferred from the evidence. *State v. Clemmons,* 753 S.W.2d 901, 909 (Mo. banc 1988).

■ Smith objects to the emphasized portions of the following argument:

> the law and the evidence in this case *undeniably* shows you that ... this man put a cord around Reverend Campbell's neck,

strangled him, and killed him … walked up the stairs, tricked Annie Miller into coming back down those stairs, followed her downstairs, put a cord around her neck, strangled her to death, walked back up those stairs, selected a knife, and stabbed her.... *And there was not one shred of evidence presented in this case in this courtroom to the contrary.*

Viewed in context, this argument closely follows Smith's own confession. The prosecutor did not misstate the evidence. Stating that there is no evidence to the contrary does not impose a burden of proof on the defendant to produce exculpatory evidence. *State v. Richardson,* 923 S.W.2d 301, 314 (Mo. banc 1996).

■■■ Smith also argues that the statement "[t]here is no mental defense here" improperly shifted the burden of proof to the defendant. This comment was made while the prosecutor was speaking of the "Chucky" references used by Smith to describe his own actions. In context, the comment is pertinent to Smith's intent and does not impose on Smith the burden to present a defense. *See id.*

■■■ Smith next takes issue with the prosecutor's statement that Smith is "fundamentally *different than the rest of us*" and "chooses to live by rules we would never dream to live by." Both sides have considerable latitude in argument. *Newlon,* 627 S.W.2d at 616. These remarks concern the severity of the crime and do not constitute reversible error. *State v. Kinder,* 942 S.W.2d 313, 329–30 (Mo. banc 1996).

■■■ Smith challenges the conclusion of the prosecutor's argument, which described the murders from the point of view of the victims. Upon review of the transcript, the prosecutor's summary directly tracks Smith's detailed confession. Such a summary would not have constituted reversible error even had Smith objected. *See State v. Ramsey,* 864 S.W.2d 320, 331 (Mo. banc 1993).

■■■ Smith also claims that the Rule 29.15 court clearly erred by denying him relief on his claim concerning his counsel's failure to object to these statements. Counsel cannot be deemed ineffective for failing to make meritless objections. *State v. Six,* 805 S.W.2d 159, 168 (Mo. banc 1991). We find no clear error.

## F. Jury Instructions

### 1. Reasonable Doubt Instructions

■■■ The trial court submitted to the jury the standard instructions concerning "proof beyond a reasonable doubt." Smith did not object at the time, but he now submits that the following language undermines the standard of "beyond a reasonable doubt":

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt.

MAI-CR 3d 302.04. We have consistently upheld this language and Smith offers no reason for us to reexamine this issue. This point is denied. *See State v. Debler,* 856 S.W.2d 641, 652 (Mo. banc 1993).

On a directly related issue, Smith appeals the denial of relief on his Rule 29.15 claim based on his counsel's failure to object to the above language. As such an objection would have been overruled, we find no clear error.

### 2. Voluntary Manslaughter Instruction

■■■ Smith argues that the trial court erred by not submitting a voluntary manslaughter instruction as to the death of Annie Miller. Although Smith did make an objection during the instruction conference, we need not decide whether Smith was entitled to a voluntary manslaughter instruction because he was not prejudiced by its absence. *See State v. Smith,* 781 S.W.2d 761, 765–66 (Mo. banc 1989), *vacated on other grounds, Smith v. State,* 495 U.S. 916, 110 S.Ct. 1944, 109 L.Ed.2d 306 (1990), *reaffirmed, State v. Smith,* 790 S.W.2d 241 (Mo. banc 1990). The jury was presented with instructions as to murder in the first degree and murder in the second degree. The second-degree murder instruction gave the jury the opportunity to

find that Smith's actions were not deliberate. Instead, the jury found that Smith had coolly reflected upon the matter. No reasonable basis exists to suggest that the jury would have reduced the conviction had they been presented with a voluntary manslaughter instruction. *See id.*

## V. PENALTY PHASE

### A. Closing Argument

■ As Smith did not object during the prosecutor's closing argument, we review the issues he raises on appeal for plain error.

■ Smith alleges that the prosecutor told the jurors that they "must" find one aggravating circumstance, and by so doing, the prosecutor foreclosed the possibility that the jurors would sentence Smith to life imprisonment. It is clear from the record that the comments were made in the context of explaining to the jurors that if they agreed on one aggravating circumstance, they could then consider the death penalty as a matter of law. The prosecutor went on to explain that if no aggravating circumstances were found, the death penalty could not be imposed as a matter of law. He also told them that they could exercise mercy even if they did find an aggravating circumstance. This argument was a proper statement of the law. *See Section 565.030.4.*

■ Smith next complains of the following remarks made by the prosecutor:

If we're going to keep people from killing people . . . we must take action.

. . . .

People need to know. People need to know we will not stand for brutal, senseless murders with aggravating circumstances. We will not standing [sic] for you killing an old woman just because she's there, just because she's a witness. We are not, not going to let the Keith Smiths of the world go without just punishment, and that is what we're asking you for.

It is proper to make statements that amount to a call for action, requesting jurors to send a message of intolerance to the community. *Kinder,* 942 S.W.2d at 329–30; *State v. Cobb,*

875 S.W.2d 533, 537 (Mo. banc 1994). Smith has not demonstrated that he suffered manifest injustice as a result of these statements.

■ Smith complains of the prosecutor's argument that the jury should not show mercy to Smith. The prosecutor was entitled to make statements of this nature. *State v. Mease,* 842 S.W.2d 98, 109–10 (Mo. banc 1992). He never told the jury that they could not show Smith mercy as a matter of law.

■ Smith insists that it was plain error for the trial court to allow the prosecutor to speak of the loss suffered by the victim's families and friends. The prosecutor spent one sentence on the topic. Such a brief, general remark is not improper. *State v. Griffin,* 848 S.W.2d 464, 471 (Mo. banc 1993).

Smith appeals the Rule 29.15 court's denial of an evidentiary hearing on his counsel's failure to object to these statements. Failing to make meritless objections does not render a counsel's performance substandard. *Six,* 805 S.W.2d at 168. This point is denied.

### B. Statutory Aggravating Circumstances

#### 1. Determination of Sentence by Court

■ For the murder of Rev. Campbell, the jury recommended a sentence of imprisonment for life without eligibility for probation or parole. The jury could not agree on a sentence for the murder of Annie Miller. Consequently, the penalty determination passed to the court. *Section 565.030.4.* Smith contends that it was plain error for the court not to require the jurors to explain the basis for the deadlock and to set out in writing any aggravating circumstances on which they did agree. He argues that such an omission prohibits the court from knowing whether or not a sentence of life imprisonment is mandated under *Section 565.032.4(1),* due to a lack of unanimity as to even one statutory aggravating circumstance. Smith misunderstands the procedure. The jurors cannot return a verdict announcing that they cannot agree on a sentence if they have not agreed on at least one statutory aggravating factor. *Section 565.030.4(1); Griffin,* 756 S.W.2d at 488; MAI–CR3d 313.40. The ju-

rors were instructed that if they could not unanimously find at least one statutory aggravating factor beyond a reasonable doubt, they must return a verdict of a life sentence. We presume that the jury acted in accordance with the court's instructions. *Griffin*, 756 S.W.2d at 488. Hence, the aggravating factor or factors that the jury did find did not have to be recorded, as we can conclude that the jury unanimously found at least one before they came to an impasse. *Id.*

## 2. Double Jeopardy

■■■ Smith also contends that without knowing what aggravating circumstances the jury found before they deadlocked, he may have been subjected to double jeopardy, as the court may have found aggravating circumstances of which the jury had already "acquitted" Smith during their deliberations. Smith relies on the holding in *Bullington v. Missouri*, 451 U.S. 430, 446, 101 S.Ct. 1852, 1862, 68 L.Ed.2d 270 (1981), that a jury verdict of life imprisonment should be treated as an "acquittal" for purposes of double jeopardy, and consequently, the death sentence cannot be sought in the event of a retrial.[12] In *Poland v. Arizona*, 476 U.S. 147, 155–56, 106 S.Ct. 1749, 1755–56, 90 L.Ed.2d 123 (1986), the Supreme Court expressly refused to extend *Bullington* to turn the penalty phase into "a set of minitrials on the existence of each aggravating circumstance" for purposes of double jeopardy. The Supreme Court stated that the relevant inquiry is whether the sentencer has " 'decided that the prosecution has not proved its case' that the death penalty is appropriate." *Id.* at 155, 106 S.Ct. at 1755, quoting *Bullington*, 451 U.S. at 443, 101 S.Ct. at 1860.

The State's burden of proof is to prove one statutory aggravating circumstance beyond a reasonable doubt, notwithstanding the jury's discretion to impose a sentence of life imprisonment even when that burden is met. *Sec-*

*tion 565.030.4.* As we can conclude that Smith's jury found at least one aggravating circumstance beyond a reasonable doubt, we can also conclude that the jury decided that the State *did* meet its burden. Therefore, the double jeopardy clause did not bar the trial court from independently considering each aggravating circumstance. We find no plain error.

## 3. Sufficiency of Evidence/Constitutional Challenge

■■■ The trial court found the following four statutory aggravating circumstances beyond a reasonable doubt: (1) that the murder of Annie Miller was committed while Smith was engaged in the commission of another unlawful homicide, (2) that her murder was committed for the purpose of receiving money or any other thing of monetary value from her or another, (3) that her murder was committed for the purpose avoiding, interfering with, or preventing lawful arrest, and (4) her murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." *Section 565.032.2(2), (4), (10), (7)*. Smith contends that there was insufficient evidence to support each circumstance. It is our statutory duty to determine whether the evidence supports these statutory aggravating circumstances. *Section 565.035.3(2)*.

The evidence was sufficient. During the guilt phase, the jury heard Smith's confession in which he admitted that he lured Annie Miller downstairs to strangle her right after he strangled Rev. Campbell. Smith himself testified during the penalty phase that he was afraid that Miller would call the police. He also testified that he left the house with Rev. Campbell's car, stereo speakers, cash, and credit cards. In his confession, Smith also admitted that he took Rev. Campbell's gun and later sold it.

12. It should be noted that the Supreme Court in *Bullington* did not address whether or not the trial court can find an aggravating circumstance of which the jury may have "acquitted" the defendant before a jury becomes deadlocked. At least two factors prevented the Supreme Court from doing so. First, the jurors did not deadlock as to Bullington's sentence—they unanimously agreed that he should be sentenced to life impris-

onment. Second, the statutory scheme in *Bullington* was different than that before us today. Even if the jury had deadlocked, the trial court, as a matter of law, could not impose the death penalty. *Section 565.006.2*, RSMo 1978. "The judge shall in no instance impose the death penalty when, in cases tried by a jury, the jury cannot agree upon the punishment." *Id.*

■ As to the "depravity of mind" statutory aggravating circumstance, Smith claims that it is unconstitutional, even with the limiting construction this court adopted in *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988).[13] Even if we readdressed this issue, and decided it in Smith's favor, the other three statutory aggravating circumstances would remain. Where there is a finding of one valid aggravating circumstance beyond a reasonable doubt, we will affirm the death sentence. *State v. Weaver,* 912 S.W.2d 499, 522 (Mo. banc 1995).

■ We do find that under *Griffin,* the evidence sufficiently supported the "depravity of mind" aggravating circumstance. Smith admitted in his confession that after tricking Annie Miller to come downstairs, she stopped short at the sight of Rev. Campbell's body, and then Smith began strangling her. The jury heard Smith testify during the penalty phase that he found an electrical cord, wrapped it around her neck, and continued to strangle her. Smith stated that after about thirty seconds she stopped struggling, then he left her on the floor, went upstairs, returned with a knife, went back upstairs, returned with a pair of scissors, and began stabbing her. This point is denied.

### C. Pamela Garrett's Letter

■ Rev. Campbell's assistant, Pamela Garrett, wrote a letter to the trial court urging that Smith be sentenced to the death penalty. At the sentencing hearing, Smith objected to the consideration of this letter as victim impact evidence. The objection was sustained. Smith now argues that there is no evidence that the judge did not read the letter and asks this Court to find plain error. The burden of proof is on Smith to prove manifest injustice. The judge explicitly stated on the record that he would make his decision without the letter. We find no error.

## VI. MOTION FOR NEW TRIAL

### A. Alleged Juror Misconduct

■ Smith's motion for new trial claimed that he had "learned subsequent to trial" that one of the jurors, Edmonia Dillard, did not reveal that her nephew had been the victim of homicide. Smith argued that Dillard's failure to disclose her nephew's murder on voir dire denied him a fair and impartial jury. The trial court denied him relief on this claim. A trial court's ruling as to the existence of juror misconduct will not be disturbed absent a finding of abuse of discretion on review. *State v. Chambers,* 891 S.W.2d 93, 101 (Mo. banc 1994).

■ When juror misconduct occurs during a felony trial, a new trial is required unless the State affirmatively shows that the jurors have not been improperly influenced as a result of the misconduct. *Id.* Before the burden shifts however, juror misconduct must be established. *State v. Brown,* 939 S.W.2d 882, 883 (Mo. banc 1997). Factual allegations in a motion for new trial are not self-proving. *State v. Pence,* 428 S.W.2d 503, 506 (Mo.1968). Smith offered no affidavits or other evidence to support his contention. Smith did not address the issue at the hearing on the motion for new trial, relying solely on the conclusory allegation in the motion. Without evidence that the relevant information existed, the trial court could not evaluate whether or not Dillard intentionally concealed any such information. The trial court did not abuse its discretion.

### B. Right to Testify

Smith alleged "pro se" [14] in his motion for new trial that he was never examined during the guilt phase as to whether or not he

13. This Court held in *Griffin* that a depravity of mind aggravating circumstance must be supported by one of the following: "mental state of defendant, infliction of physical or psychological torture upon the victim as when the victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime." 756 S.W.2d at 489.

14. The point reads: "Defendant contends pro se that his right to testify during trial was breached ..." Apparently Smith insisted that his counsel add this point to the motion for new trial that his counsel signed and submitted.

understood his right to testify.[15] Review of the record proves otherwise. Before the defense rested, Smith's counsel conducted the following examination:

Q: And during our many conversations we have discussed that you have a right in a case such as this either to testify or not to testify; is that correct?

A: Yes.

Q: Okay. And if you decided not to testify, the judge would read the jury an instruction that they could not hold that against you?

A: Yes.

Q: Okay. And you understood that?

A: Yes.

Q: Okay. And you also understood that you had the right to testify, to let the jury know what your testimony would be concerning this matter?

A: Yes.

. . . . .

Q: And we spoke again this morning about the different instructions that the judge would—at least when we talked this morning, what the judge was inclined to possibly instruct the jury?

A: Yes.

Q: And based on those instructions you and I had, we made a determination that it may not be in your best interests to testify; is that correct?

A: Yes.

Q: And you've reached that conclusion yourself after thinking about it, not to testify; is that correct?

A: Yes.

. . . . .

Q: So you understand clearly that you have your right to testify, but you've decided not to; is that correct?

A: Yes.

The trial court, therefore, did not err in overruling Smith's motion for new trial based on this claim. Smith insisted in his pro se Rule 29.15 motion that he was forced not to

testify during the guilt phase. The motion court did not clearly err in denying Smith relief on this point as it is conclusively refuted by the record. *Rule 29.15(g)*.

## VII. RULE 29.15 MOTION

■ We now address the remainder of the issues that Smith raises regarding the denial of his Rule 29.15 motion and amended motion without an evidentiary hearing. "[I]f the court shall determine the motion and the files and records of the case conclusively show that the movant is entitled to no relief, a hearing shall not be held." *Rule 29.15(g)*. Further, the motion must cite facts, not conclusions, which if true, demonstrate that he is entitled to relief. *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992).

■ Relief on an ineffective assistance of counsel claim is appropriate if the movant shows that his "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984). We review the motion court's findings and conclusions for clear error. *Rule 29.15(j)*.

At the outset, we note that the amended motion, in which the following claims were raised, suffers from the conclusory manner in which the claims are set forth. Although some claims are discussed at great length, the discussion is general, and not specific to Smith's trial. Other claims of substandard performance are grouped together in lists of sentence fragments, without factual support or discussion as to how the outcome of the trial would have been different but for the alleged deficiencies of Smith's counsel.

### A. Constitutionality of Rule 29.15

Smith's Rule 29.15 motion challenged the constitutionality of Rule 29.15 in general and as applied to his case based on its "unreason-

___

**15.** As previously discussed, Smith did testify during the penalty phase.

ably short time limitations." The motion court rejected the challenge as the time limits that applied to Smith have consistently been upheld. *See State v. Ervin,* 835 S.W.2d 905, 929 (Mo. banc 1992). Smith gives us no persuasive reason to reexamine the issue.

### B. Constitutionality of the Death Penalty

Smith's motion also challenged the constitutionality of Missouri's death penalty statutes, claiming that they afford unrestricted discretion to the State as to whether to seek the death penalty, that they lack provisions for meaningful proportionality review, and that no legitimate state interest exists to justify such a statutory scheme. The motion court denied the claim as these exact arguments have been repeatedly rejected by this Court. *See State v. Smulls,* 935 S.W.2d 9, 23 (Mo. banc 1996); *State v. Brown,* 902 S.W.2d 278, 291 (Mo. banc 1995); *State v. Chambers,* 891 S.W.2d 93, 113 (Mo. banc 1994); *State v. Parker,* 886 S.W.2d 908, 933 (Mo. banc 1994); *State v. Wise,* 879 S.W.2d 494, 524 (Mo. banc 1994). Smith does not offer a convincing argument for reexamination.

Smith also maintains that the motion court clearly erred in overruling his Rule 29.15 claim that his counsel was ineffective for not objecting to the sentence on these grounds. Given the strength of precedent affirming Missouri's statutory scheme, this point is denied.

### C. Failure to Investigate

#### 1. Mental Health and Background

 Smith contended in his motion that his counsel was ineffective for failing to investigate Smith's mental and psychiatric health and status, intelligence levels, substance abuse history, family history of substance abuse and mental illness, education, and background. Smith argued that had his counsel conducted such an investigation, he would have sought a second opinion after reviewing the court-ordered evaluation. This evaluation was never made part of the record, but the record does reflect that the court requested that the report include opinions as to whether Smith suffered from a

mental disease or defect, whether Smith was competent to stand trial, and whether Smith appreciated the wrongfulness of his conduct at the time of the incident. At the pretrial hearing Smith's counsel informed the court that after reviewing the report with Smith, he had decided to stipulate that Smith was competent to stand trial and not to present a defense of mental disease or defect.

The motion court found that Smith's allegations were conclusory as he did not offer "what specifically such evidence would have shown." Smith alleged that there was "ample evidence" that would have proved Smith incompetent to stand trial or that would have changed the outcome of the trial. The only fact alleged in the motion, however, was that Smith had suffered a "serious head injury." The record shows that the jury heard this evidence. The record also shows that the examination that was conducted was done at the request of Smith's counsel. Smith's motion did not allege what information a second evaluation would have produced. Failing to discover a psychiatrist that would find Smith incompetent to stand trial or unable to determine right from wrong does not constitute ineffective assistance. *See State v. Taylor,* 929 S.W.2d 209, 225 (Mo. banc 1996).

Review of the record additionally reveals that Smith's counsel presented evidence to the jury during penalty phase that Smith grew up in a broken home, had to repeat kindergarten, had problems in grade school with reading and writing, took special education classes in high school, and dropped out after the eleventh grade. The jury also heard that Smith began smoking marijuana at the age of six or seven, and that the frequency and severity of his drug use increased until at the time of the murders Smith was using PCP and cocaine on a daily basis. Smith's counsel could not have presented this evidence without investigating Smith's mental and social history. We find no clear error.

#### 2. Rev. Campbell's Lifestyle

 Smith's motion alleged as ineffective his counsel's failure to investigate Rev. Campbell's lifestyle. This argument concerns the credibility of Smith's statement in

his confession that Rev. Campbell had provoked him by proposing that the two engage in acts of a homosexual nature. We find no clear error in the denial of this claim. Again, the record conclusively refutes it. The testimony of the only defense witness concerned this very issue. The witness worked as a driver for Rev. Campbell and testified that Rev. Campbell had propositioned him in a similar manner and that he had heard several people say that Rev. Campbell was homosexual. Smith did not allege what additional available information was not presented or how he was prejudiced by its absence. Counsel will not be found ineffective for failing to present cumulative evidence. *State v. Parker,* 886 S.W.2d 908, 930 (Mo. banc 1994).

### D. Failure to Voir Dire Trial Judge

█ Smith's motion alleged that his counsel's failure to voir dire the trial judge concerning his views on the death penalty constituted ineffective assistance. Smith did not allege that the judge was biased in any way. His argument apparently is based on the belief that it is mandatory in death penalty cases that the trial judge be examined as the judge will have to determine the sentence if the jury cannot unanimously agree. We have previously rejected this contention. *See State v. Whitfield,* 939 S.W.2d 361, 372 (Mo. banc 1997). As Smith offers no relevant authority in support of his claim, we find no clear error.

### E. Failure to Present Expert Testimony

█ Smith's motion alleged that it was ineffective for his counsel not to present testimony of a psychopharmacologist to interpret the toxicology report that showed positive results for cocaine and marijuana metabolites a day after he confessed. He argued that such testimony should have been presented at the motion to suppress his confession and at trial because the report was not self-explanatory. He did not allege in his motion what such testimony would have revealed, however. We find no clear error in the denial of the claim.

### F. Failure to Object

#### 1. Pamela Garrett's Testimony

█ Smith's motion alleged that his counsel was ineffective for failing to object to Pamela Garrett's testimony during the guilt phase. Garrett stated that when she went inside Rev. Campbell's house to look for him, she noticed that "the murderer's clothes" were gone, referring to Smith's clothes. The motion court denied the claim as conclusory. We find no clear error. Smith did not allege that had his counsel objected after the jury heard Garrett say "murderer," the objection would have been sustained, or that the outcome of the trial would have been different. The record shows that the prosecutor alerted Garrett to what she had said, that she apologized, and that she did not say it again. The record also shows that the jury heard Smith's confession in which he described in detail how he strangled and stabbed Rev. Campbell and Annie Miller in succession. An objection to one reference to Smith as a "murderer" would not have affected the outcome of the trial. This point is denied.

#### 2. Phone Bill

█ Smith's motion alleged that his counsel's failure to object to the introduction of the bill for Rev. Campbell's carphone denied him a fair trial as the record was hearsay and the State had laid no foundation on which to introduce it. The motion court held that this allegation was conclusory as it did not allege that, had the objection been raised, it would have been granted, or would have changed the outcome of the trial. We find no clear error. Pamela Garrett, Rev. Campbell's assistant, testified from the phone bill that she did not recognize some of the phone calls made on November 17, 1991. Even if this testimony had been stricken upon objection, the outcome of the trial would not have been different. The record shows that the jury heard Smith's confession in which he admitted that after killing Rev. Campbell and Annie Miller, he stole the car containing the carphone. The jury also heard Smith's girlfriend testify that she had seen Smith use Rev. Campbell's carphone after the murders took place.

### G. Motion for New Trial

 Smith's motion also alleged that his counsel's motion for new trial was ineffective. He argued that his counsel should have raised as error the denial of his challenge for cause against Elfriede Marley, who went on to serve on the jury. His challenge was based on the fact that she was preoccupied with spending time away from a new job after being unemployed for eighteen months. The trial court overruled his challenge. The Rule 29.15 court denied this point as conclusory. We find no clear error as Smith did not allege in his Rule 29.15 motion that had the issue been raised, he would have been granted a new trial.

## VIII. REVIEW OF SENTENCE

In accordance with *Section 565.035.3*, we find, after examining the record in this case, that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We find that the evidence supports the trial court's finding of one statutory aggravating circumstance as required by *Section 565.030.4(1)*, and supports the three other aggravating circumstances found. *See supra* part V.B.3. Finally, we find that the sentence is proportionate to other cases where the sentencer found beyond a reasonable doubt that the murder was committed while the offender was engaged in commission of another unlawful homicide; the murder was committed for the purpose of receiving money or other items of monetary value; the murder was committed for the purpose of avoiding or preventing the offender's lawful arrest; or the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind. *State v. Smulls*, 935 S.W.2d 9 (Mo. banc 1996) (multiple homicides, pecuniary gain); *State v. Richardson*, 923 S.W.2d 301 (Mo. banc 1996) (multiple homicides, attempt to prevent lawful arrest, depravity of mind); *State v. Gray*, 887 S.W.2d 369 (Mo. banc 1994) (multiple homicides, attempt to prevent lawful arrest); *State v. Powell*, 798 S.W.2d 709 (Mo. banc 1990) (multiple homicides, depravity of mind); *State v. Oxford*, 791 S.W.2d 396 (Mo. banc 1990) (multiple homicides, depravity of mind); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988) (multiple homicides, pecuniary gain, attempt to prevent lawful arrest, depravity of mind); *State v. Sloan*, 756 S.W.2d 503 (Mo. banc 1988) (multiple homicides, depravity of mind); *State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988) (multiple homicides, depravity of mind).

## IX. CONCLUSION

For all of the foregoing reasons, we affirm the judgments.

All concur.