**STATE of Missouri, Respondent,**

v.

**Frank E. JOHNSON, Appellant.**

**No. KCD 26356.**

Missouri Court of Appeals,
Kansas City District.

Dec. 31, 1973.

Willard B. Bunch, Public Defender Sixteenth Judicial Circuit, Kansas City, for appellant; James R. Sandifar, Certified Law Intern, of counsel.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, C. J., and PRITCHARD and SOMERVILLE, JJ.

PRITCHARD, Judge.

Upon an indictment of first degree murder of one Leonard Peters, appellant was convicted by a verdict of a jury of second degree murder and his punishment was assessed and adjudged to be 99 years imprisonment in the Department of Corrections, with full credit for time previously spent in jail.

The sufficiency of the evidence to support the verdict (except as to the cause of death) is not challenged. Suffice it to relate that on November 20, 1971, near a restaurant at 2818 Troost in Kansas City, Missouri, appellant struck Peters upon the head with a pistol. Peters fell to the sidewalk and appellant and one Williams dragged him behind an apartment building where appellant kicked and stomped him two or three times. When dragged behind the building, Peters appeared to be unconscious. After being called to the scene, Detective James Smith found Peters, an elderly white male, between two buildings at the rear of the restaurant, and observed external injury or wounds on his head. Detective Smith took several photographs of the body.

Appellant claims that the testimony of Dr. William H. Bryan, Coroner of Jackson County, Missouri, since January 1, 1969, was improperly admitted as to the cause of Peters' death because it was hearsay. On direct examination Dr. Bryan testified that he participated in the autopsy of Peters' body on November 20, 1971,

at the morgue of General Hospital. The autopsy was performed at the morgue of General Hospital to determine the cause of Peters' death. Dr. Bryan testified that there were external signs of injury or wounds to the body: lacerations (cuts) and abrasions of the face and neck with fractures of the facial bones. These cuts and abrasions were described in detail, and as to bones, "There is depression of the bones of the upper face and the zygoma on each side and the maxillary bones are crepitant, depressed, and moveable", and they could be moved abnormally with the pressure of the finger. There were no additional external wounds. The autopsy itself developed these internal injuries: "There is a linear two inch fracture of the roof of the right orbit", this being the bony covering of the eye, the socket. "There is a fracture of the—there is a transverse fracture of the body of the fifth cervical vertebra just above the intervertebral disc. * * * And it's just above the joint space, without dislocation of the fragments. And the spinal canal shows about three centimeters of blood in the epidural space at the same level. Q. Was there any internal discovery of injuries to the neck as far as respiratory passages would be concerned? A. There was blood in the respiratory passages. * * * Q. All right, sir. Now, Doctor, based on what you found in this particular autopsy, are you prepared to give with reasonable medical certainty the cause of this man's death? A. Yes, sir. * * * Q. That cause is what, sir? A. The first is massive blunt type injuries of the face and neck including: a. Multiple depressed fractures of the maxillae, upper portion of the nose and both zygomas. Fracture of the roof of the right orbit. Transverse fracture of the body of the fifth cervical vertebra with three milliliters of blood adjacent. Fracture separation of the left clavicle. Major laceration across the right frontal region and over nose. Abrasions of skin of jaw and lateral to right eye. Aspirated blood in the tracheobronchial tree. Acute passive congestion of the lungs. Q. All right, sir. And did you then determine the cause of death? A. Yes, sir. Q. And that was, please? A. The cause of death was massive injuries to face and neck with multiple fractures. The immediate mechanism of death involved airway compromise and probable concussion of the cervical spinal cord."

On cross-examination these questions were asked and these answers elicited from Dr. Bryan: "Q. Doctor, you appear to have been reading from some notes or a report while you were giving your testimony. A. Yes, sir. Q. May I see that, please? Which one is it that you were reading from, Doctor? A. The blue one. Q. The blue copy? A. Yes, sir. Q. All right. Thank you. Doctor, excuse me for asking this. I am somewhat confused. This report is signed by Thomas J. Fritzlen, M. D. That's not you, is it? A. By no means. Q. Is he a member of your staff? A. Yes, sir. Q. Were you present at the time that this— A. Yes, sir. It's in the top. Q. —procedure was made? A. It's on the top sheet of that blue sheet who was present. Q. It says that you witnessed what Dr. Fritzlen did in the way of an— A. I was there during the time when it was done. Q. Well, you didn't assist him? A. Well, in a sort of way he's responsible. Q. Well, did you do any of the surgical procedures that are required in an autopsy yourself? A. Well, I felt the areas involved. Q. All right. That's not what I asked you, Doctor. Did you perform any of the surgery on the body? A. No, I didn't do any of the surgery. Q. All right. And as a matter of fact, you didn't—let's go back a step further. Isn't it the ordinary procedure while the physician does this, the pathologist does this, for him to speak about what he finds, and possibly it's recorded then and there and from that he prepares his report? A. No. Q. All right. Does he make up his report by himself afterwards, after he has completed the surgical procedures? A. Yes. Q. And were you present when he did that? A. No, I wasn't there. Q. So what you have been reciting

here is the words of somebody else, is that correct? [An objection made by the state was overruled.] Q. (By Mr. Schwarz) You have been reciting the words of Dr. Fritzlen? A. I was reciting the written report of the pathologist concerning Dr. Thomas Fritzlen." The following objection was overruled: "MR. SCHWARZ: Well, your Honor, I am sorry to be obstreperous or anything, but we have to make an objection to the testimony of the witness. It's hearsay testimony and not the witness' own recollections. So we ask the Court to remove it from the record and instruct the jury to disregard it."

On further cross-examination it was elicited from Dr. Bryan that there were no reports in his office wherein autopsies on dead bodies were done at the request of the police department that show he actually performed the autopsies himself. These conditions of deceased set forth in the report are not (or may not be) life-threatening injuries: Multiple depressed fractures of the maxillae, upper portions of nose and both zygomas; fracture of the roof of the right orbit; fracture separation of the left clavicle; major laceration across the right frontal region and over the nose; abrasions of the skin about the jaw and lateral to the right eye; and moderate atherosclerosis, which is deposits of fat in the lumen of the coronary vessels.

Considering Dr. Bryan's testimony as a whole, there is nothing therein that he observed or that he personally had any knowledge of Dr. Fritzlen's report that: "The immediate mechanism of death involved airway compromise and probable concussion of the cervical spinal cord." There is nothing to indicate that he observed a transverse fracture of the body of the fifth cervical vertebrae, or that there were about three centimeters of blood in the epidural space of the same level. All these matters were obviously the result of findings made by Dr. Fritzlen, who actually performed the autopsy surgery in which Dr. Bryan acknowledged that he did none of, although he felt the areas involved. The question

descends to that of the immediate mechanism of death, above quoted. Other conditions were described by Dr. Bryan as not being, or might not be, life-threatening. Thus, in the posture presented, the immediate mechanism of death, a crucial question as to appellant's guilt or innocence of the murder charged, was hearsay as to Dr. Bryan. In his cross-examination, Dr. Bryan acknowledged that he was reading from the report prepared by Dr. Fritzlen which contained matters of which Dr. Bryan had no personal knowledge.

"Generally speaking, there must be a factual basis for the opinion of an expert witness and this basis must appear in the evidence. * * * Generally speaking, an expert witness may not express an opinion on matters not observed by him and not put in evidence by the testimony of others or on statements made to him out of court by a person other than accused and not put in evidence." 23 C.J.S. Criminal Law § 885, pp. 486, 489. See the factually analogous case of Jones v. State, 205 Md. 528, 109 A.2d 732 (1954), where it was held prejudicially erroneous to admit testimony of a doctor who was head of a department, which testimony was objected to as hearsay, where he had not made a personal examination of the victim of an abortion, but whose testimony gave the impression of being from personal knowledge. Compare also Ortiz v. Ortiz, 465 S.W.2d 662, 663 [1, 2] (Mo.App.1971), where a clinical psychologist gave an opinion based on notes made by a "participating observer" as to behavior of children, the objection to the opinion being held to have been properly sustained. This case did not proceed upon the method of proof of the cause of death by way of a hypothetical question based upon other facts in evidence relating to the condition of decedent, there being *no* competent facts as to that condition. To have permitted a hypothetical question not based upon facts proven in evidence would have been error. State v. Decker, 340 Mo. 972, 104 S.W.2d 307, 311 [10, 11] (1937). "It is improper for one expert to base his opinion upon the

oral or written opinion of another expert unless the opinion of such other expert is in evidence and is included as an assumed fact in a hypothetical question." Hornberger v. St. Louis Public Service Company, 353 S.W.2d 635, 641 [4, 5] (Mo.1962). There is no testimony here that Dr. Bryan personally observed the condition of decedent's cervical area, which according to Dr. Fritzlen's report, was the immediate mechanism of death. It is not helpful to the state's case that Dr. Bryan did feel the areas involved, and observed fractures about the head of decedent, especially in view of his testimony that those injuries were not, or might not be, life-threatening. Although on direct examination Dr. Bryan gave an opinion as to the cause of death of decedent, the cross-examination brought out that the opinion was hearsay, and it was thus rendered to be without probative value. See Zeigenbein v. Thornsberry, 401 S.W.2d 389 (Mo.1966); and Steele v. Woods, 327 S.W.2d 187, 197 [15, 16] (Mo. 1959).

The state argues that the report of Dr. Fritzlen and any testimony based thereon could come into evidence under the business record exception to the hearsay rule. It may be that it could have been admitted upon that basis had it been properly qualified under § 490.680, RSMo 1969, V.A.M.S., "if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, * * *" See State v. Anderson, 384 S.W.2d 591, 603 [19] (Banc Mo.1964), where a hospital record of an examination of an unknown body (later identified as the body of the victim of a murder) was held properly admitted into evidence where it was qualified under § 490.680. Here, Dr. Fritzlen's report was not offered as a business record under the statute, and was not in evidence at all.

Since there must be a new trial because of prejudicial error in admitting the hearsay testimony of Dr. Bryan, other points presented need not be considered.

The judgment is reversed and the case remanded for new trial.

All concur.