**STATE of Missouri, Respondent,**

v.

**Leon V. TAYLOR, Appellant.**

**No. 78086.**

Supreme Court of Missouri,
En Banc.

April 29, 1997.

As Modified on Denial of Rehearing
May 27, 1997.

Melinda K. Pendergraph, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Becky Owenson Kilpatrick, Asst. Attorney General, Jefferson City, for respondent.

BENTON, Judge.

A jury convicted Leon Taylor of first degree murder, first degree robbery, first degree assault, and three counts of armed criminal action. After the jury deadlocked on punishment for first degree murder, the judge sentenced Taylor to death on the murder charge and life imprisonment plus 315 years for the other charges. The post-conviction court overruled Taylor's Rule 29.15 motion. This Court has exclusive appellate jurisdiction. *Mo. Const. art. V., sec. 3.* This Court affirms the convictions, affirms the sentences except for the sentence of death which is reversed, and remands for a new penalty phase proceeding. The appeal of the judgment on the Rule 29.15 motion is affirmed in part and dismissed as moot in part.

## I.

█ This Court reviews the facts in the light most favorable to the verdict. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). On April 14, 1994, Taylor, his half-brother Willie Owens, and his half-sister Tina Owens were driving in Tina's car, discussing various robbery possibilities. Taylor suggested a gas station in Independence where only one person would be working. The trio went to the station and purchased some gasoline. Taylor asked whether they were going to rob it. Tina Owens said no because a little girl was inside. Sarah Yates, an eight-year-old, was keeping company with Robert Newton, her stepfather and the gas station manager.

The three left the station, only to return a few moments later after the oil light came on. Willie Owens went into the station and asked for some oil. Taylor next entered the store and stated they needed a different weight of oil. Taylor then drew a pistol and stated that he would shoot Newton unless he gave them money. Newton complied, handing Owens approximately $400 in a bank money bag. Owens took the money and returned to the car.

Taylor directed Newton and the child to the station's back room. Taylor shot Newton once in the head, killing him. Taylor then pointed the gun at the child. Taylor pulled the trigger, but the gun jammed and did not discharge. Frustrated, Taylor locked the child in the back room and returned to the car. Taylor told Willie and Tina Owens that he had shot the man and that he had to go back inside to get the little girl. However, because the Owenses wanted to leave, they then drove away.

## II. Pretrial Issues

### A. Continuance

Taylor claims that the circuit court abused its discretion and violated the United States and Missouri constitutions by denying a one-day continuance. Taylor argues that the continuance was needed to remedy the prosecutor's bad faith acts: (1) late endorsement of a witness; (2) interference with deposing the late endorsed witness; and (3) failure to inform the defense of a deal with Willie Owens.

█ The decision to grant or deny a continuance is within the sound discretion of the trial court. *State v. Schaal,* 806 S.W.2d 659, 666 (Mo. banc 1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). A very strong showing of abuse and prejudice must be shown. *Id.* citing *State v. Nave,* 694 S.W.2d 729, 735 (Mo. banc 1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 901 (1986). Inadequate preparation does not justify a continuance where counsel had ample opportunity to prepare. *Id.* citing *State v. Crahan,* 747 S.W.2d 721, 722 (Mo. App.1988).

█ Regarding the first two issues, defense counsel Zembles traveled to Kansas

City four days before trial to depose the witness, was unable to do so, and lost a day of preparation. While this incident may have inconvenienced counsel, Taylor never demonstrated what specific matters defense counsel did not complete due to the trip.

■ Regarding the State's dealings with Willie Owens, Taylor concedes that the State cannot be blamed for reaching agreement on the day of trial. Although defense counsel Zembles missed part of individual *voir dire* in order to depose Owens, Taylor did not demonstrate how the jury selection or trial was compromised by Zembles' temporary absence. Moreover, Taylor had two attorneys, Zembles for the guilt phase and McKerrow for the penalty phase. McKerrow was present throughout the *voir dire*. Since individual *voir dire* here was primarily designed to question potential jurors about their attitude towards punishment and the death penalty, McKerrow's presence sufficiently protected Taylor's interests.

On this record, the trial court did not abuse its discretion nor violate Taylor's constitutional rights in denying a continuance.

### B. Discovery Issues

#### 1. Sarah Yates' Counseling Records

The circuit court refused Taylor's request for Sarah Yates' counseling records. Taylor claims this violated his rights to compulsory process, confrontation, due process, and freedom from cruel and unusual punishment. The compulsory process claim falls under the due process clause, and Taylor cites no applicable cruel and unusual punishment authority, so only the confrontation and due process claims need be addressed. *State v. Parker*, 886 S.W.2d 908, 916 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). *See Pennsylvania v. Ritchie*, 480 U.S. 39, 56, 107 S.Ct. 989, 1000–01, 94 L.Ed.2d 40 (1987).

■ The accused has the right "to be confronted with the witnesses against him." *U.S. Const. amend. VI; See Mo. Const. art. I, sec. 18(a); State v. Hester*, 801 S.W.2d 695, 697 (Mo. banc 1991). The right to confront is satisfied if defense counsel has wide latitude at trial to cross-examine witnesses; it does not include a right to pretrial disclosure of any and all information that might assist cross-examination. *Ritchie*, 480 U.S. at 53, 107 S.Ct. at 999. Taylor seeks pretrial disclosure of potentially helpful information; he does not assert that the trial court limited cross-examination. Thus, there was no confrontation clause violation.

■ Taylor's due process claim invokes *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The State must disclose evidence in its possession that is favorable to the accused and material to guilt or punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. The accused, however, must make "some plausible showing [of] how the information would have been material and favorable." *Ritchie*, 480 U.S. at 58 n. 15, 107 S.Ct. at 1002, n. 15, *quoting United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982).

■ After reviewing the counseling records *in camera*, the trial court found "absolutely nothing in those records that would be relevant to whether or not she's been coached." The court also stated that the records did not contain any pre-deposition statements except "very vague remembrances of blood coming out of my daddy's head and things like that. None of the circumstances of how it happened, okay?" Since the records were not material and favorable, the trial court's ruling was proper.

■ Taylor also claims the circuit court had a *sua sponte* duty to disclose the records for use in the penalty phase. The counseling records were briefly mentioned in the penalty phase to show Yates' psychological harm. However, since most of the testimony was non-expert and factual, the trial court had no *sua sponte* duty to order disclosure of the counseling records at that point.

#### 2. Arrest Records of State Witnesses

Taylor claims the circuit court violated his confrontation and equal protection rights by not ordering disclosure of Willie and Tina Owens' arrest records.

In reviewing criminal discovery claims, this Court will overturn the trial court only if it appears that the trial court abused its discretion to the extent that fundamental unfairness to the defendant resulted. *State v. Mease*, 842 S.W.2d 98, 108 (Mo. banc 1992), citing *State v. Royal*, 610 S.W.2d 946, 951 (Mo. banc 1981).

Rule 25.03(A)(7) requires disclosure of the prior convictions of the State's intended witnesses. Rule 25.04(A) permits disclosure of additional material if the defense specifies the material or information sought and the court finds the request is reasonable and the information sought is relevant and material to the defendant's case. Arrests that do not result in convictions are relevant and material only to show a specific interest, motive to testify favorably for the state, or expectation of leniency. *See State v. Wise*, 879 S.W.2d 494, 510 (Mo. banc 1994), *cert. denied*, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995).

Taylor asserts that the arrest records were relevant and material to show self-interest or motive. In fact, Taylor fully cross-examined and impeached Willie and Tina Owens regarding their conversations with the State and Willie's leniency agreement. Because Taylor did not demonstrate that additional material was relevant and material, the trial court did not abuse its discretion by denying disclosure of the arrest records.

Taylor also asserts, for the first time on appeal, that the court allowed the State to use witnesses' arrest records and denied the defense an opportunity to do the same. In fact, the record simply has no evidence of the State's use of the arrest records. Point denied.

### III. Juror Issues

### A. Juror Misconduct

Taylor asserts that the circuit court plainly erred in failing to quash the venire panel *sua sponte* after learning that the victim's relatives conversed with four females that Taylor alleged were on the venire.

The trial court is vested with broad discretion in determining if a jury panel should be dismissed, and, absent a clear abuse, the trial court's ruling should not be disturbed. *State v. Smulls*, 935 S.W.2d 9, 19 (Mo. banc 1996), citing *State v. Evans*, 802 S.W.2d 507, 514 (Mo. banc 1991). In addition, because the issue of juror misconduct was not presented in the motion for a new trial, Taylor must demonstrate manifest injustice resulting from the alleged error. *Rule 30.20*.

On the third day of *voir dire*, veniremember Cynthia Taylor spoke to the court and counsel in chambers regarding a conversation she had overheard. According to Ms. Taylor, two of the victim's relatives approached four females sitting on a bench outside the courtroom and initiated the following dialogue:

A ... [T]hey said is this the Leroy Taylor—I think the first name is Leroy, Leon.

Q Leon Taylor?

A Leon Taylor case and one of the ladies on the bench said yes and what did she say next? Then this woman asked us, well, have you seen this case on the news? And you know about it? And the other lady said no and I said well, I don't think we are supposed to really know anything about it and I didn't say anything and this lady's friend came up from behind me and I said oh, are you in the other room waiting to be questioned? And that's when the first lady said no, he murdered my brother-in-law.

Q Okay. Is that all she said?

A That's what she said and then I said I don't think we are supposed to be talking to you and they both left.

Q Is that the only words that were said?

A Yeah.

The court asked Ms. Taylor whether the four females were members of the venire. After viewing the panel in court later that morning, Ms. Taylor stated unequivocally, "No, I don't see those ladies. There were 4 of the ladies and me. I don't see the other 4." After noting that no other veniremembers were

involved in the conversation, the trial court struck Ms. Taylor for cause.

Since there is no proof of juror misconduct, the trial court did not abuse its discretion nor create manifest injustice in failing to quash the venire panel *sua sponte*.

### B. Voir Dire

■■■ Taylor argues that the trial court unduly limited individual death qualification *voir dire*. Control of *voir dire* is within the discretion of the trial court; only abuse of discretion and likely injury justify reversal. *State v. Bannister*, 680 S.W.2d 141, 145 (Mo. banc 1984), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985); *State v. Gray*, 887 S.W.2d 369, 382 (Mo. banc 1994), *cert. denied*, 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995). Review of the record reveals no abuse of discretion in limiting individual death qualification *voir dire*, which lasted almost 22 hours. Point denied.

### C. Batson Challenge

Taylor asserts the trial court erred by: (1) not striking veniremembers Chubick and Sessler for cause; (2) striking veniremember Parris for cause; (3) applying different standards to evaluate the State's and Taylor's strikes for cause; and (4) allowing the prosecutor to peremptorily strike prospective jurors on the basis of race.

### 1.

■■■ This Court need not review the trial court's decision not to remove veniremember Chubick or Sessler because neither served on the jury. "The qualifications of a juror on the panel from which peremptory challenges by the defense are made shall not constitute a ground for ... reversal of a conviction or sentence unless such juror served upon the jury at defendant's trial and participated in the verdict rendered against the defendant." *494.480.4* RSMo 1994.[1]

### 2.

■■■ The circuit court struck veniremember Parris for cause on the State's motion. When a questionable venireperson is

excused, for reasons unrelated to the person's scruples against the death penalty, appellant cannot show prejudice. *State v. Reuscher*, 827 S.W.2d 710, 714 (Mo. banc), *cert. denied*, 514 U.S. 1119, 115 S.Ct. 1982, 131 L.Ed.2d 869 (1995). The trial court removed Parris because "her general demeanor led me to believe that it was somewhat questionable that she could be fair and impartial in view of what she said." This decision is not an abuse of discretion. *See State v. Wise*, 879 S.W.2d at 512.

### 3.

Taylor claims that in assessing strikes for cause, the trial court used conflicting standards based on whether the State or defense requested the strike. Because this issue is raised for the first time on appeal, we review only for plain error. *Rule 30.20; State v. Isa*, 850 S.W.2d at 884. Review of the record reveals that the trial court properly considered the potential jurors' responses and demeanor to determine whether they could be impartial. Point denied.

### 4.

■■■ Taylor asserts that the prosecutor violated his equal protection rights by using peremptory challenges to exclude jurors on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 90, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). To establish a claim under *Batson*, the defendant must object to the prosecutor's use of peremptory challenges as violating *Batson* and identify the cognizable racial group to which the stricken veniremember belongs. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc), *cert. denied*, 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992). The State then must provide race-neutral explanations for the peremptory challenges. *Id.* If the prosecutor articulates an acceptable reason, the defendant must prove that the State's proffered reasons were merely pretextual and that the strikes were in fact racially motivated. *Id.* An appellate court will not overturn such a finding unless clearly erroneous. *Parker*, 836 S.W.2d at 939, n. 7,

---

1. All references are to RSMo 1994 unless otherwise indicated.

*citing Hernandez v. New York,* 500 U.S. 352, 368–69, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991), and *State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988).

After the prosecutor provided race-neutral explanations—age, demeanor, education, and death penalty views—for striking venire-members Gordon, Johnson, and Loveland (all African–Americans), defense counsel did not allege that the reasons were pretextual.

■ As to Loveland, defense counsel first objected three days later, after the venire was dismissed. Concluding that the State's explanations were race-neutral, the court found no prima facie showing of *Batson* discrimination. Normally, a defendant must challenge a State's explanation prior to discharge of the venire so that the trial court can correct the alleged error without having to call a new venire and select a new jury. *Parker,* 836 S.W.2d at 936–37. Nevertheless, an examination of the prosecutor's reasons for striking Loveland indicates that the trial court decision was not clearly erroneous.

■ Since Taylor challenges the State's explanations regarding Gordon and Johnson for the first time on appeal, he has abandoned these claims. A defendant's failure to challenge the State's race-neutral explanation in any way waives any future complaint that the State's reasons were racially motivated, and leaves nothing for this Court to review. *See State v. Jackson,* 925 S.W.2d 856, 864 (Mo.App.1996); *State v. Fritz,* 913 S.W.2d 941, 946 (Mo.App.1996).

■ Taylor also claims that the trial court erred in denying defendant's motion to videotape *voir dire* to record the demeanor of the veniremembers for appellate review. There is no requirement that the trial court videotape *voir dire,* and this Court declines to impose such a requirement.

## IV. Guilt Phase

### A. Right to Confront Witnesses and Present a Defense

#### 1. Testimony of Dr. Berkland

Dr. Mitruka performed the autopsy of Robert Newland and incorrectly concluded that the entrance wound was at the back of the victim's neck. Dr. Mitruka was later dismissed from his position as Medical Examiner for Jackson County. Dr. Berkland, acting Medical Examiner for Jackson County, testified at trial. After independently reviewing the autopsy photographs, Dr. Berkland concluded that the bullet entered through the victim's forehead and exited through the back of the neck. He based his opinion on the fact that the entrance wound was completely circular, while the exit wound had a small linear tear. The parties do not dispute this identification of the wounds.

■ Taylor asserts that the trial court improperly limited cross-examination of Dr. Berkland as to Dr. Mitruka's credentials, his dismissal, and his erroneous conclusion about the wounds. The accused in a criminal prosecution has the right to confront the witnesses against him at trial. *U.S. Const., amend. VI; Mo. Const. Art. I, sec. 18(a).* This includes the opportunity to cross-examine effectively the witnesses against him at trial. *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987).

On cross-examination, the trial court allowed defense counsel to explore Dr. Mitruka's erroneous autopsy conclusion and his dismissal. The trial court limited additional inquiry because the issues were collateral and undisputed. Furthermore, Dr. Mitruka's credentials were not relevant to Dr. Berkland's testimony since Dr. Berkland did not rely solely on the autopsy report and in fact reached conclusions contrary to Dr. Mitruka's.

■ Taylor further claims that the trial court limited his ability to present a defense by prohibiting the introduction of Dr. Mitruka's autopsy report. In fact, the autopsy report was never actually offered into evidence. Because admissibility of the autopsy report was not expressly decided or ruled upon by the trial court, this Court will not consider the issue on appeal. *See State v. Blakeburn,* 859 S.W.2d 170, 177 (Mo.App. 1993).

### 2. Testimony of Willie and Tina Owens

Taylor requests a new trial, asserting that the trial court violated his confrontation rights by limiting cross-examination of Willie and Tina Owens.

■■■ The scope of cross-examination and the determination of matters of witness credibility are largely within the discretion of the trial court. *State v. Dunn,* 817 S.W.2d 241, 245 (Mo. banc 1991), *cert. denied,* 503 U.S. 992, 112 S.Ct. 1689, 118 L.Ed.2d 403 (1992). "Among the reasons for permitting trial judges wide latitude for the purpose of imposing reasonable limits on cross-examination are concerns about prejudice, confusion of the issues, and interrogation that is only marginally relevant." *Id.* The trial court does not abuse its discretion when excluding offers of impeachment on immaterial or collateral matters. *State v. Taylor,* 486 S.W.2d 239, 244 (Mo.1972), citing *State v. Miles,* 412 S.W.2d 473, 476 (Mo.1967).

As to Willie Owens, Taylor argues that the trial court prevented questions necessary to establish bias, motive, and interest. In fact, the trial court allowed questions regarding Willie's agreement with the State and desire to obtain leniency for Tina Owens, and imposed only minimal limits on cross-examination.

Taylor also contends that the trial court improperly limited cross-examination of Tina Owens on a key issue. Defense counsel questioned Tina about the weapons and ammunition used in the crimes, highlighting prior inconsistent statements. The circuit court sustained objections regarding Tina's complete gun arsenal because it was a collateral matter—the ownership of other guns was not a key issue due to Taylor's confession and other evidence that he alone shot the victim with a pistol. Point denied.

### B. Closing Argument

Taylor claims that the prosecutor's rebuttal argument impermissibly alluded to Taylor's decision not to testify. The prosecutor responded to a defense argument that the gun could have gone off accidentally by stating:

Ms. Zembles has been up here arguing for her client and again, at no time has there been any explanation made to you as to how that man could have accidentally been shot.

The trial court overruled defense counsel's objection.

■■■ A prosecutor may not comment adversely on the defendant's decision not to testify. *State v. Richardson,* 923 S.W.2d 301, 314 (Mo. banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996). While a direct reference generally requires reversal, an indirect reference is improper "only if the prosecutor demonstrates a calculated intent to magnify the defendant's decision not to testify so as to call it to the jury's attention." *Richardson,* 923 S.W.2d at 314. Description of the State's evidence as uncontradicted or undisputed is not a reference to the defendant's failure to testify. *Id.; State v. Ramsey,* 864 S.W.2d 320, 330 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994).

■■■ Here the prosecutor commented on the lack of evidence supporting the defense theory, not Taylor's silence. Since Taylor was not the only person who could explain an accidental firing, any reference to his failure to testify was only indirect.

Taylor also attacks the State's rebuttal argument as personal vouching:

Tina testified and didn't have to. She can beat this case she believes, why come in and testify, why even put her on the stand to say she was even there. Why have anything to do with this case at all? And Willie's not getting that sweet of a deal. Willie committed robbery and he's going to the penitentiary for it and what shaved off his time was to help us convict the man who that night committed Murder in the First Degree and the man who that night was so vicious and so cold and so deliberate that he was going to take the life of a little 8 year old girl. And that's a decision I will make and I will do it again when it comes to selecting witnesses such as Willie Owens for a case like this. When we want someone who that night would commit acts the way they were committed.

Since Taylor raises this argument for the first time on appeal, this Court reviews only for plain error. *Rule 30.20; Isa,* 850 S.W.2d at 884.

■■■■ A prosecutor may state personal opinions on matters, including guilt, where they are fairly based on the evidence. *State v. Tokar,* 918 S.W.2d 753, 769 (Mo. banc), *cert. denied,* — U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). A prosecutor may comment on the evidence and the credibility of the witnesses. *State v. Weaver,* 912 S.W.2d 499, 513 (Mo. banc 1995), *cert. denied,* — U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996). Most of the quoted argument discussed the State's dealings with Tina and Willie Owens, and did not urge conviction based on the prosecutor's assessment of the evidence. While the prosecutor should not have emphasized his personal reasons for selecting Willie as a witness, the statement does not constitute manifest injustice. *Cf. State v. Kreutzer,* 928 S.W.2d 854, 876 (Mo. banc 1996), *cert. denied,* — U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997).

### C. Instructions

### Voluntary Intoxication Instruction

■■■ Taylor contends that the trial court erred by submitting Instruction 5—identical to MAI–CR3d 310.50—because there was insufficient supporting evidence and it unconstitutionally shifted the State's burden of proof. Instruction 5 stated:

> The state must prove every element of the crime beyond a reasonable doubt. However, in determining the defendant's guilt or innocence, you are instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct.

*MAI–CR3d 310.50.* (effective 10–1–94). An appellate court will reverse only if there is error in submitting an instruction and prejudice to the defendant. *Rule 28.02(f).*

The Notes on Use in effect at the time of Taylor's trial stated the instruction "may be given when relevant evidence of voluntary intoxication has been admitted." MAI–CR3d 310.50, Notes on Use 3. (10–1–94); *see sec. 562.076.3.* In a videotaped confession, Taylor stated that the three had been "ridin' around, drinking a little bit" when they decided to rob someone. Later, the following discussion occurred:

> [Detective] OK. Then you told me earlier that this was an accident, that you did not intend to shoot the gas station attendant. Do you feel like when you say its an accident that you're not familiar with handguns? Have you any training with handguns?
>
> [Taylor] No.
>
> [Detective] And, uh, you feel like your finger was on the trigger and the hammer was back on the gun or how do you feel like this gun discharged accidentally?
>
> [Taylor] I don't know.
>
> [Detective] Just that you were nervous and drinking?
>
> [Taylor] Yeah.

Because evidence of intoxication had been submitted as a potential explanation for the shooting, the trial court submitted this instruction so that the evidence would not be improperly used to negate Taylor's mental intent. *Sec. 562.076.3.*

■■■ Taylor also claims that the revised version of MAI–CR3d 310.50 fails to remedy the constitutional flaw found in the earlier version of MAI–CR3d 310.50. *State v. Erwin,* 848 S.W.2d 476, 483–84 (Mo. banc), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993). This Court held that the prior pattern instruction (which read "You are instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct") implicitly relieved the State of its burden of proof of intent. *Erwin,* 848 S.W.2d at 483–84. Since *Erwin,* MAI–CR3d 310.50 was revised to include the opening sentence: "The state must prove every element of the crime beyond a reasonable doubt." *MAI–CR3d 310.50* (effective 10–1–94). The current instruction "explicitly directs the jury's attention to the state's burden to prove every element of the crime." *State v. Bell,* 906 S.W.2d 737, 740 (Mo.App.1995); *See State v. Armstrong,* 930 S.W.2d 449, 451–52 (Mo.App.1996). There is no constitutional error in Instruction 5.

### Reasonable Doubt Instruction

The claim that Instruction 4—patterned after MAI–CR3d 302.04—violates Taylor's constitutional rights by diluting the definition of "reasonable doubt" is once again rejected. *See Kreutzer,* 928 S.W.2d at 872.

## V. Penalty Phase

### A. Closing Argument

Taylor alleges that the trial court erred by overruling his objection to the prosecutor's argument that the jury impose death based on emotion. In this case the jury deadlocked on punishment for first degree murder, and the trial court sentenced Taylor to death.

Near the end of closing argument, the prosecutor initiated the following:

Mr. Miller told you in the first stage of this trial that at that point this case was to be decided on the facts, the evidence and the law. Cold, calculated. You were to be as cold and calculated as this man was. And you did your job. *Now it is the time you can put your emotion into it. Now it is time that you can show your outrage. Now it is time to get mad. You can get mad at this man.*

MS. MCKERROW: Objection, Your Honor.

THE FOLLOWING PROCEEDINGS WERE HAD AT THE BENCH:

MS. MCKERROW: Judge, I think that's improper argument. I think inviting the jury to base their decision on anger and emotion is telling them not to follow the law.

THE COURT: Overruled.

(emphasis added). The State immediately repeated the argument:

*You can be mad at him now.* Now you can go up to that room....

(emphasis added). During her argument, defense counsel addressed the prosecutor's argument:

Mr. Hunt asks you to be angry. I ask you that if you are angry and I am assuming that you are, that when you go up to deliberate, you take whatever time you need to let that anger pass because experience shows that decisions as important as this made in anger and the heat of passion may well be decisions regretted in the future. Take your time, let your anger pass and decide the punishment based on the instructions, the evidence and the law.

On rebuttal, the prosecutor again encouraged the jury to rely on emotion:

Think about everything in this case, take your time and make your decision based upon the evidence, the law, the facts and *your emotions.*

(emphasis added).

▇▇ As the State concedes, it is improper to urge the jury to impose the death penalty based on emotion, not reason. *State v. Storey,* 901 S.W.2d 886, 902 (Mo. banc 1995). "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977), followed in *Lankford v. Idaho,* 500 U.S. 110, 124–26, 111 S.Ct. 1723, 1731–32, 114 L.Ed.2d 173 (1991); *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983); and *California v. Brown,* 475 U.S. 1301, 1304, 106 S.Ct. 1367, 1368, 89 L.Ed.2d 702 (1986).[2] The General Assembly incorporated this principle into Missouri's capital sentencing procedure: With regard to death sentences, this Court shall determine whether the sentence was imposed under the influence of "passion, prejudice, or any other arbitrary factor." *Sec. 565.035.3(1).*

▇▇ The State argues that since the jury was not the final sentencer, there was no prejudice. However, this Court will review Taylor's claim because he asserts that, but for the errors, the jury may have assessed

---

**2.** In response to the dissent, the reference in *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859 (1976), to "society's moral outrage" is directed to the legislature's implementation of that outrage, and in no way supports the prosecutor's appeal to—and the trial court's approval of—emotion, outrage, and anger. *Collier v. State,* 101 Nev. 473, 705 P.2d 1126, 1129–30 (1985), *cert. denied,* 486 U.S. 1036, 108 S.Ct. 2025, 100 L.Ed.2d 611 (1988).

punishment at life imprisonment without the possibility of parole. *Richardson,* 923 S.W.2d at 319.

Urging the jury to "get mad" and decide the case based on "emotion" was impermissible. Moreover, because the court overruled the objection to the criticized language, the appeal to emotion had the stamp of approval of the trial court. *See State v. Barton,* 936 S.W.2d 781, 788 (Mo. banc 1996); *State v. Williams,* 659 S.W.2d 778, 782 (Mo. banc 1983), citing *State v. Jones,* 615 S.W.2d 416, 420 (Mo.1981).

Based on this record, this Court finds a reasonable probability that the jury would have reached a different result without the improper argument. *See State v. Barton,* 936 S.W.2d 781, 788 (Mo. banc 1996); *State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993). This Court finds error and prejudice warranting reversal of the death penalty.

### B. Other Penalty Phase Issues

Taylor raises several other penalty phase issues. Because he is entitled to a new trial on the issue of punishment, only one issue likely to recur on retrial need be addressed.

Taylor seeks reversal based on the victim impact part of the PSI report. In the PSI, many of the victim's relatives expressed their belief that Taylor should be sentenced to death. The victim's brother stated, "I feel he [Taylor] should get the death penalty." and further elaborated that:

> I feel it would be unjust for Leon Taylor to get anything less than the death penalty. He should not have the right to be able to draw breath after he stopped someone else from breathing! He should not be allowed to see his family; we will never see Robert again.

Sarah Yates, the victim's step-daughter and witness to the murder, communicated to the PSI officer that "[she] feels very strongly that Leon Taylor should be executed for killing her father and trying to kill her." The victim's uncle stated, "I hate to see him get the death penalty, but you shouldn't take anything you can't give." Finally, the victim's wife stated, "Taylor should be sentenced to death for what he has done, so he will never have the chance to do this to someone else."

The State concedes that admission of a victim's family members' characterizations and opinions about the appropriate sentence are inadmissible under *Payne v. Tennessee,* *Sec.217.762.4,* *565.030.4,* and *595.209.1(4).* *Payne v. Tennessee,* 501 U.S. 808, 830 n. 2, 833, 111 S.Ct. 2597, 2611 n. 2, 115 L.Ed.2d 720 (O'Conner, J., concurring) and 835 n. 1, 111 S.Ct. at 2614 n. 1 (Souter, J., concurring), 501 U.S. 808, 824–26, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991). Here a judge determined Taylor's sentence. This Court presumes that inadmissible evidence is neither prejudicial nor fundamentally unfair because judges are presumed not to consider improper evidence during sentencing. *Richardson,* 923 S.W.2d at 319; *State v. Roll,* 942 S.W.2d 370, 378–79 (Mo. banc 1997). Although these requests for the death penalty were error, Taylor has failed to show prejudice that constitutes fundamental unfairness.

### VI. Post–Conviction Proceedings on Guilt Phase Issues

This Court reviews the denial of post-conviction relief to determine whether the motion court's findings of fact and conclusions of law are "clearly erroneous." *Rule 29.15(j); State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). Findings and conclusions are clearly erroneous if, after a review of the entire record, the appellate court is left with the definite impression that a mistake has been made. *State v. Shurn,* 866 S.W.2d 447, 468–69 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

### A. Ineffective Assistance of Counsel

Taylor alleges two grounds of ineffective assistance of counsel during the guilt phase: (1) failure to object, investigate, and make an adequate offer of proof regarding Dr. Mitruka's incompetence and Dr. Berkland's testimony; and (2) failure to submit a jury questionnaire. In order to prevail, Taylor must prove by a preponderance of the evidence that counsel failed to exercise the

customary skill and diligence that a reasonably competent attorney would exercise in similar circumstances and he was prejudiced as a result. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

### 1. Testimony of Dr. Berkland

Taylor asserts that trial counsel failed to investigate adequately Dr. Mitruka's competence, object to Dr. Berkland's hearsay testimony, and make an adequate offer of proof regarding the relevancy of the autopsy report and the facts demonstrating Dr. Mitruka's incompetence.

■ Taylor cites no facts supporting his argument that counsel failed to adequately investigate Dr. Mitruka's competence, and none were presented at the motion hearing. The failure to pursue a claim raised in a point relied on is an abandonment of the claim. *Rule 30.06(e); State v. Silvey,* 894 S.W.2d 662, 671 (Mo. banc 1995); *State v. Light,* 835 S.W.2d 933, 936 (Mo.App.1992).

■ Taylor next asserts that trial counsel was ineffective for failing to object to Dr. Berkland's testimony as hearsay based solely on Dr. Mitruka's autopsy report. In fact, Dr. Berkland's trial testimony did not recite Dr. Mitruka's conclusions. As stated in section IV.A.2, Dr. Berkland disagreed with many conclusions in the autopsy report and made his own conclusions from a review of the autopsy photographs and the State's evidence. Consequently, this case is distinguishable from *State v. Johnson,* 504 S.W.2d 334 (Mo.App.1973). Moreover, Dr. Berkland, as an expert, could rely on the report of another without admitting it as long as that evidence is of a type reasonably relied upon by other experts in that field. *State v. Hendrix,* 883 S.W.2d 935, 940 (Mo.App.1994); *State v. Rowe,* 838 S.W.2d 103, 109–10 (Mo. App.1992). Since Dr. Berkland's testimony was not hearsay, Taylor has failed to show incompetence of counsel and prejudice. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

Taylor also asserts that counsel did not make a sufficient offer of proof on Dr. Mitruka's incompetence and the autopsy report's relevance. As indicated above, the trial court correctly ruled that specifics on Dr. Mitruka's qualifications and the autopsy report were collateral and irrelevant. Since an expanded offer of proof would not have benefited Taylor, trial counsel did not act unreasonably or prejudice Taylor. *See Sidebottom v. State,* 781 S.W.2d 791, 799 (Mo. banc 1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990).

### 2. Jury Questionnaire

■ The circuit court ordered defense counsel to submit a proposed jury questionnaire by November 21, 1994. Defense counsel did not timely do so. As a result, the trial court used a jury questionnaire from a prior death penalty case and allowed the attorneys to ask additional questions. Review of the *voir dire* proceedings reveals that counsel was given sufficient latitude to ask questions and select and disqualify potential jurors. As the motion court correctly concluded, no prejudice resulted from use of the court's questionnaire.

### B. Disqualification of Judge

Taylor asserts that the judge erred in overruling the motion to disqualify himself from ruling on the postconviction motion. Although Taylor's reasons for seeking disqualification were readily apparent, he waited thirty days after filing his amended 29.15 motion—one week before the hearing date—to file a motion to recuse. Nevertheless, Taylor asserts that the trial judge had a duty to recuse himself because the judge was a potential witness to "disputed evidentiary facts" at the 29.15 hearing.

■ Effective administration of justice prefers that the trial judge oversee the 29.15 hearing. *Thomas v. State,* 808 S.W.2d 364, 367 (Mo. banc 1991); *State v. Wells,* 804 S.W.2d 746, 749 (Mo. banc 1991). Absent allegations of bias sufficient to require disqualification from a postconviction relief proceeding and compelling evidence from the record or elsewhere in support of those allegations, the trial judge should not be called as a witness and disqualified from conducting that proceeding. *See State v. Wise,* 879 S.W.2d 494, 523 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656

(1995). A judge should recuse where "the judge's impartiality might reasonably be questioned ..." *State v. Smulls*, 935 S.W.2d 9, 26 (Mo. banc 1996), *citing* Rule 2, Canon 3D. Since Taylor's claim of judicial bias is meritless, the court properly denied the motion.

### C. Rule 29.15 Time Limits

Taylor contends that the time limitations of Rule 29.15 are unconstitutional. This claim has been repeatedly raised and rejected. *State v. Weaver*, 912 S.W.2d 499, 520 (Mo. banc 1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996); *Bullard v. State,* 853 S.W.2d 921, 923 (Mo. banc), *cert. denied,* 510 U.S. 979, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993); *State v. Ervin,* 835 S.W.2d 905, 929 (Mo. banc 1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

### VII.

This Court affirms the convictions, affirms the sentences except for the punishment of death which is reversed, and remands for new penalty phase proceedings consistent with this opinion. The judgment on the Rule 29.15 motion is affirmed in part and dismissed as moot in part.

HOLSTEIN, C.J., and PRICE, LIMBAUGH, COVINGTON and WHITE, JJ., concur.

ROBERTSON, J., dissents in separate opinion filed.

ROBERTSON, Judge, dissenting.

I concur in the majority's decision to affirm the conviction in this case. I respectfully dissent, however, from the majority's decision to reverse the death sentence because the prosecutor said in closing argument during the penalty phase:

Now is the time you can put your emotions into it. Now is the time that you can show your outrage. Now is the time to get mad. You can get mad at this man.

And,

Think about everything in this case, take your time and make your decision based upon the evidence, the law, the facts and your emotions.

The majority relies on two cases to support its conclusion. In *State v. Storey,* 901 S.W.2d 886, 901–2 (Mo. banc 1995), this Court reversed the death sentence of William Storey because the prosecutor made four arguments that: invited the jury to consider facts outside the record and contained the prosecutor's personal opinion about the crime; invited the jury "to put themselves" in the victim's place; equated the jury's function with self-defense; and suggested that the jury weigh the value of the victim's life against the defendant's in reaching its sentencing recommendation. The Court condemned the first three of these arguments for, among other things, inciting the jury to decide with their emotions rather than with reason.

I had hoped that the four arguments condemned by the majority in *Storey* required reversal because of their cumulative impact, not individually. Taken together, those arguments were both qualitatively and quantitatively more egregious than the prosecutor's isolated remarks in this case. The *Storey* comments were graphic; these are not. The *Storey* comments painted gruesome pictures of the manner in which the defendant hacked and mutilated the victim's body; the comments in this case do not.

But the decision in this case makes clear that for the majority, any argument offered by the state that suggests directly or indirectly that a non-rational basis can play any role in the jury's penalty decision is *per se* grounds for reversal of a death sentence. I disagree.

I dissented in *Storey,* 901 S.W.2d at 903–06 (Robertson, J., dissenting). I was not able to persuade my colleagues with quotations from Aristotle or with references to the findings of modern science that emotion and reason walk hand-in-hand in every human decision. To those words I offer two additional authorities: Daniel Goleman's observed that "[t]he predominant models among cognitive scientists have lacked an acknowledgment that rationality is guided by ... feeling." D. GOLEMAN, EMOTIONAL INTELLIGENCE 41

type placeholder>

(1995). And Richard Weaver reminds that "[w]hen we affirm that philosophy begins with wonder, we are affirming in effect that sentiment is anterior to reason. We do not undertake to reason about anything until we been drawn to it by an affective interest." R. WEAVER, IDEAS HAVE CONSEQUENCES 19 (1948). There is little purpose in repeating in full what I said in *Storey*. I remain of the view that people are more than cold carriers of binary code who can employ pure logic in deciding whether a man who gunned down an eight-year-old's stepfather in her presence and, then, tried but failed to kill her deserves the death penalty.

To determine whether the penalty phase meets the demands of the constitution, two separate legal standards apply: the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment. The majority does not employ an Eighth Amendment analysis in this case. Instead, the majority relies on the plurality opinion[1] in *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977), for authority. *Gardner* is a due process case. A Florida trial judge imposed the death sentence over a jury recommendation of life in prison. In imposing that sentence, the trial court relied on a pre-sentence investigation that the jury did not see and that contained information that the defendant had no opportunity to explain or deny. The Supreme Court's plurality holding says:

> We conclude that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.

*Id.* at 362, 97 S.Ct. at 1207.

The sentence from *Gardner* the majority quotes as authority for its holding here—"It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion"—is little more than a general statement of legal principle. It is dicta dressed up with no place to go. This is because Justice Stevens's plurality opinion makes no apparent effort to connect that "rule" with the facts of the case. Of particular import for this Court's purposes here, there is no claim that emotion infected the *Gardner* trial at all. Therefore, I do not see how *Gardner* applies to this case.

Nor is it plain to me how the majority's reference to section 565.035.3(1), RSMo 1994, applies. That statute requires the Court to determine whether a sentence was imposed under the influence of "passion." The majority apparently assumes that "emotion" and "passion" are the same for all purposes. They are not. In the sense in which the statute uses "passion," it means "the influence of what is external and opposes thought and reason...." Webster's Third New International Dictionary 1651 (1976). "Emotion" as the prosecutor meant it here means "the affective aspect of consciousness: feeling." *Id.* at 742. Our criminal law notes the difference, recognizing crimes of passion as crimes committed in the absence of all reason and deliberation. Section 565.023.1(1), RSMo 1994. One can surely deliberate, however, in the presence of emotion.

In applying a due process standard, one must not forget individual words and sentences are part of a process that must be considered in its totality to determine not only the presence of error, but also its prejudice, if any. That process includes the trial court reading painstakingly crafted instructions designed to assure that the jury's deliberations are channeled in accordance with the processes demanded by the law. The jury is told that the lawyers' arguments are not evidence. And the jury is told both sides of the case—the defendant's often emotional plea for mercy and understanding as well as the state's argument that death is appropriate under the law and facts of the case.

1. Only two other justices agreed with Justice Stevens's due process analysis there. Chief Justice Burger concurred in the judgment without comment. Justice Blackmun concurred in the judgment on *stare decisis* grounds. Justice White concurred in the judgment on Eighth Amendment grounds. Justices Brennan and Marshall concurred on the basis of their conviction that the Eighth Amendment prohibits capital punishment in every instance. Then–Justice Rehnquist dissented.

What is the proper standard? It is sufficient for these purposes to say that error occurs where the state's argument or the court's instructions ask the jury to ignore reason and base its decision either solely or too heavily on emotion. Where the jury is invited to use emotion together with reason, the state's argument merely acknowledges the way *homo sapiens* makes decisions. "As Aristotle saw, the problem is not with emotionality, but with the *appropriateness* of emotion...." (Emphasis in original.) *Goleman*, xiv.

Turning first to the second of the prosecutor's statements, it is apparent that the state invites the jury to apply all of the law, the facts and their emotion to their penalty decision. This seems entirely consistent with due process when considered in the context of human decisional modes and when cabined by instructions that direct the jury's deliberation.

What about the invitation to express "outrage," "to get mad?"

In *Gregg v. Georgia*, 428 U.S. 153, 183, 96 S.Ct. 2909 [2929–30], 49 L.Ed.2d 859 (1976) (plurality), we find these words:

> In part, the death penalty is an expression of society's *moral outrage* at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.... "When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown seeds of anarchy...."

(Emphasis added.) *Id., quoting Furman v. Georgia*, 408 U.S. 238, 308, 92 S.Ct. 2726, 2761, 33 L.Ed.2d 346 (1972)

(Stewart, J. concurring). We also find these words:

> [I]n order to maintain a respect for law, it is essential that the punishment inflicted for grave crimes should adequately reflect the *revulsion felt* by the great majority of citizens for them.... The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrongdoer deserves it....

*Gregg*, 428 U.S. at 183, n. 30, 96 S.Ct. at 2930, n. 30, *quoting* Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950) (testimony of Lord Justice Denning).

The jury in a criminal case represents society. The jury expresses society's judgment as to guilt and, in a first degree murder case, society's judgment as to whether a murderer should live or die.

In this case the prosecutor asked the jury to express "outrage." If *Gregg v. Georgia* can be believed, that is one of the purposes of the death penalty. As I read the majority opinion, a prosecutor violates the due process clause when he or she merely quotes from *Gregg* or uses "anger" and "mad" as synonyms for the outrage and revulsion to which *Gregg* speaks.

To hold as does the majority, one must conclude (which I do not) that the state's comments misstate the law and from that (faulty) premise conclude that jurors hear only those words upon which the majority fixes and ignore all of the rest of the due process and Eighth Amendment protections built into the penalty-phase hearing. Even assuming, *arguendo*, that the premise is proper, the danger of the majority's view is that it permits the minutiae to become the whole. In this case, a verdant forest of due process and Eighth Amendment protection surrounds the majority's acorn. The majority sees only the acorn and misses the forest. Unless the Court is convinced—as it must be to reach its holding—that the prosecutor's words carried such force that they overrode the ability of the members of the jury to reason, consider the evidence, apply the court's instructions, and reflect on the defendant's arguments, this sentence should stand. As I am convinced to the contrary, I would affirm this sentence.

As must be apparent by now, I would affirm the death sentence along with the judgment of guilt.