

# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | **WD86080** |
| **Respondent,** | ) | |
| **v.** | ) | **OPINION FILED:** |
| | ) | |
| **JOHNNY SHERMAN PARDEE, JR.,** | ) | **October 29, 2024** |
| | ) | |
| **Appellant.** | ) | |
| | ) | |

**Appeal from the Circuit Court of Pettis County, Missouri
The Honorable Robert Koffman, Judge**

**Before Division Three:  Thomas N. Chapman, Presiding Judge,
Lisa White Hardwick, Judge, and Alok Ahuja, Judge**

Johnny Pardee appeals his convictions for statutory sodomy in the first degree and two counts of child molestation in the second degree.  In two points on appeal, he contends that (1) the trial court erred in not allowing him to publish a forensic interview of the victim before cross-examination of the interviewer and the victim so that he could question them about the contents of the interview and (2) the evidence was insufficient to support his conviction for second-degree child molestation for touching the victim's breast.  The case is remanded to the trial court for entry of a corrected written judgment that conforms to the trial court's oral pronouncement of sentence for first-degree statutory

sodomy. In all other respects, the judgment is affirmed.

## Factual and Procedural Background[1]

In May 2021, the ten-year-old victim ("Victim") was living with her mother ("Mother") and her brother. Her father ("Father"), who was divorced from Mother, lived in a separate residence. Mother began dating Pardee in early 2021. Pardee would sometimes spend the night at Mother's house.

On the night of May 17, 2021, Pardee and Mother were in Mother's bedroom, drinking alcohol and watching TV. Pardee asked Mother if the kids were sleeping, and Mother said yes. Pardee asked her if she was sure, and she again said yes. At Pardee's request, they went to each child's room to make sure they were sleeping. Pardee had never done this before.

At around 11:00 p.m., Mother left the home to get cigarettes and alcohol from a nearby gas station. Victim woke up and saw Pardee standing in her doorway.[2] Pardee approached her bed, and Victim told him to please leave her alone because she was tired and needed to sleep. Pardee said that he would leave, but he leaned on Victim's bed and was "kinda in [her] face." Victim continued to ask him to leave. Pardee whispered,

---

[1] In criminal cases, the appellate court views the evidence in the light most favorable to the jury verdict, disregarding all contrary evidence and inferences. *State v. Campbell*, 600 S.W.3d 780, 784 n.1 (Mo. App. W.D. 2020).

[2] Victim reported Pardee's actions during a forensic interview that was conducted on May 20, 2021. The videotaped interview was introduced into evidence at trial and played for the jury at the end of the State's evidence. Victim also testified at trial. She was eleven years old at the time of trial.

2

"Goodnight," and then started touching her "inappropriately."

Pardee pulled the blanket off Victim and first rubbed the outside and then inside of her thigh over her clothing with his hand. He then touched and rubbed her vagina over her clothing with his hand. He also touched and squeezed her right breast over her clothing with his hand. He touched her vagina again over her clothing. Pardee then "tried to go up [her] shirt" with his hand but did not get above her stomach because Victim pulled away from him and put the blanket back over herself. Pardee told Victim that they needed to "keep it between [them]" and that she couldn't tell anybody. Pardee unzipped his pants, grabbed Victim's hand, and made her touch his penis. He instructed her to grab it, squeeze it, and "stroke it." Victim was scared and shaking and very uncomfortable during the touching.

Pardee went back to Victim's doorway when he saw Mother's car returning home. Pardee again told Victim that she "better not tell anybody" and that he was "not playing around." Although she knew it was wrong, she said that she would not tell because she "didn't want him to do anything to [her]." Pardee told Victim that he was going to come back and asked her, "Can I touch you later?" Victim said no.

When Mother entered her bedroom, she found Pardee sitting on the edge of her bed. He said, "[W]hat took you so long. You were an hour and 45 minutes." Mother and Pardee eventually went to sleep.

After Pardee left Victim's room, she immediately texted her Father using her iPad. Texts sent between 12:57 a.m. and 1:00 a.m. read:

3

I'm shaking her boyfriend came in here and touched me and made me touch his private and said he's not playing and that I can't tell anyone and that he's gonna come later I need help I'm scared I'm just trying to sleep

I'm gonna hide my ipad tomorrow so he won't see this

I told him I just want to go to sleep and that this is wrong because mom just got home when he left the room and then he acted normal

I'm really scared I really am

I want to cry

I can't lose (sic) my door because it would lock me in there and I want to sleep on the bathroom floor because I hate him

Because she was worried that Pardee would come back to her room when her mother was asleep, Victim went into the bathroom to sleep, as it had the only door that locked. She set an alarm to wake up early, so no one else would not know that she slept in the bathroom.

The next morning, while Mother was still asleep, Pardee came to Victim's room and told her to get dressed. He continued to stand in her doorway, and Victim said, "In front of you?" and "Can you leave?" Victim changed in the bathroom and went into the living room to watch television until it was time to go to the bus stop.

Victim sat in the middle of the couch between Pardee and her brother. Pardee put his arm up on the back of the couch behind Victim and touched her hair and lightly pulled it so that her brother would not notice. Victim leaned forward with her forearms on her legs so that Pardee could not touch her hair. Pardee slowly put his hand down by his side and touched Victim's leg. Victim got up and went to sit on the edge of the bed in

**4**

Mother's room (Mother was still sleeping). Pardee walked into the room and looked mad and confused as to why Victim left the couch. He pointed to the couch and whispered, "Go." Victim refused and instead sat in a chair at the breakfast bar. Pardee sent Victim's brother into his room to get something so that he could talk to Victim. He told Victim, "You need to stop with the attitude." Victim responded that he was a "creep" and told him to leave her alone. Pardee said that he "didn't mean to hurt" her, "I'll get you whatever you want if you don't tell," and "Are you going to forgive me?" Victim left to go to the bus stop and Pardee told her one last time, "You better keep your mouth shut." Victim put her iPad in her backpack and took it to school with her because she did not want Pardee to see that she had texted her Father.

When Father woke up that morning, he saw Victim's texts from the night before. He forwarded the texts to Mother and to an aunt. He then got in his truck and headed to Mother's house. On the way, he saw a sheriff's vehicle parked at a local auto shop. Father found Victim walking to the bus stop. He asked her if her texts were true, and Victim started crying. He told her to get into the truck and then drove back to the auto shop. Father told a sheriff's deputy what had happened, and the deputy told Father to go to the sheriff's office and file a report.

Father took Victim back to the bus stop and told her tell a teacher or counselor what had happened. At school, Victim told her teacher and the counselor that her mother's boyfriend had come into her bedroom the night before and touched her inappropriately. She told the counselor that Pardee had threatened to come back and that

she did not know if she would be safe when she got home. The counselor made a report to the Child Abuse and Neglect Hotline. Investigators from Children's Division and the sheriff's department came to the school that day and interviewed Victim.

Mother woke up a little after 9:00 a.m. that morning and began watching TV next to Pardee, who was asleep. She turned on her phone and saw the messages from Victim (that Father had forwarded to Mother). Mother got up, went outside, and called law enforcement. She then woke up Pardee and told him to leave. Pardee went into the bathroom and started yelling "fuck, fuck, fuck" and banging on the wall. The sheriff's deputy who Father had spoken to earlier arrived at Mother's house, and Mother showed him the text messages. Pardee called a relative, and she picked him up from Mother's house.

Pardee was charged as a prior and persistent offender with one count of first-degree statutory sodomy for having deviate sexual intercourse with Victim by engaging in an act involving the hand of Victim and the genitals of Pardee; one count of second-degree child molestation for knowingly subjecting Victim to sexual contact by touching her vagina or genitals through her clothing; and one count of second-degree child molestation for knowingly subjecting Victim to sexual contact by touching her breast through her clothing.

Trial was conducted in December 2022, and the jury found Pardee guilty as charged. The trial court sentenced Pardee as a persistent offender to life imprisonment for statutory sodomy and fifteen years' imprisonment for each count of child molestation

**6**

and ordered the sentences to run concurrently.

This appeal by Pardee followed.

## Point One

In his first point on appeal, Pardee contends that the trial court abused its discretion in not allowing him to publish the video of Victim's forensic interview prior to cross-examination of the forensic interviewer and Victim so that he could question them about the contents of the video. He asserts that depriving him of the opportunity to ask the interviewer about leading questions she asked during the interview and to ask Victim about inconsistent statements she made during the interview about the touching of the penis and the breast prevented him from presenting a complete defense.[3] The State contends that Pardee failed to preserve this claim of error because he did not make an

---

[3] Pardee does not claim a Confrontation Clause violation. "The United States Constitution and Missouri Constitution provide that an accused shall enjoy the right to be confronted with witnesses against him in criminal prosecutions." *State v. Ogle*, 676 S.W.3d 489, 493 (Mo. App. W.D. 2023) (citing U.S. Const. amend. VI; Mo. Const. art. I, sec. 18(a)). "An accused's right to confront the witnesses against him is satisfied when he is given the 'wide latitude at trial to cross-examine witnesses….'" *Id.* (quoting *State v. Taylor*, 944 S.W.2d 925, 931 (Mo. banc 1997)). "The Confrontation Clause places no constraints on the use of a declarant's prior testimonial statements against the accused when the declarant is available and subject to cross-examination at trial." *Id.* (citing *Crawford v. Washington*, 541 U.S. 36, 59 n.9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Section 491.075.1(1) and (2), RSMo 2016, permits the admission of a child's out-of-court statement as substantive evidence if it bears sufficient indicia of reliability and the child testifies at the proceeding. Even if the statement is otherwise admissible under section 491.075.1, its admission may violate the Confrontation Clause if it is testimonial and the defendant has not had the opportunity to cross-examine the child. *Ogle*, 676 S.W.3d at 493. "While a meaningful opportunity for cross-examination is necessary, the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *State v. Perry*, 275 S.W.3d 237, 244 (Mo. banc 2009)).

adequate offer of proof regarding the interviewer's alleged leading questions or Victim's alleged prior inconsistent statements.

A trial court has broad discretion to admit or exclude evidence and to determine the extent and scope of cross-examination. *State v. Michaud*, 600 S.W.3d 757, 761 (Mo. banc 2019); *State v. Bryant*, 686 S.W.3d 324, 327 (Mo. App. E.D. 2024). To preserve a claim that evidence was improperly excluded, "the proponent must attempt to present the excluded evidence at trial and, if it remains excluded, make a sufficient offer of proof." *Michaud*, 600 S.W.3d at 761 (internal quotes and citation omitted). An offer of proof must demonstrate to the trial court what the rejected evidence would show, educating the trial court as to the admissibility of the proffered testimony and allowing it to consider the testimony in context. *Id.* at 761-62. "Offers of proof must show what the evidence will be, the purpose and object of the evidence, and each fact essential to establishing admissibility." *Id.* at 762 (internal quotes and citation omitted).

Pardee did not preserve his claim for appellate review. After the State's direct examination of the forensic interviewer, the State moved to admit the one-hour-and-ten-minute video of the forensic interview of Victim. The trial court admitted the exhibit without objection. Before cross-examination of the interviewer, defense counsel requested to play the interview for the jury. The prosecutor stated that it was the State's case and that he was going to play/publish the interview right before the State rested or before Victim testified. The trial court ruled that defense counsel could not play the video during cross-examination of the interviewer because the video had not yet been

published.  Defense counsel argued that he would be unable to use the video to cross-examine the interviewer or the child.  He asserted that he was entitled to cross-examine the interviewer about leading questions she asked during the interview and to cross-examine Victim as to inconsistencies in her statements during the interview.  The trial court asked defense counsel what the inconsistencies were.  Defense counsel vaguely asserted that Victim "initially didn't disclose or tell any detail about the actual allegations" or "the actual touching of the penis or actual touching of the breast."  The trial court stated that defense counsel was "going to get a chance to cross-examine [Victim], and compare why she said this and not that."  It said, "You ask [Victim].  You point out a minute in the video where the inconsistencies are."  The trial court also asked defense counsel what the leading questions were, but defense counsel did not identify any and requested his objection be noted.  Finally, in his motion for new trial, Pardee only generally alleged that the trial court erred in prohibiting defense counsel from cross-examining the interviewer or Victim about statements made during the interview.

Pardee failed to make adequate offers of proof.  Pardee only generally argued that he wished to cross-examine the interviewer about leading questions she asked and to cross-examine Victim about inconsistent statements she made during the interview.  He vaguely argued that Victim initially did not disclose or detail the actual touching of the penis or the breast.  He did not, however, inform the trial court what the interviewer's and Victim's testimony would be so that it could consider the testimony in context and determine its admissibility.  Pardee's failure to make a specific offer of proof during the

**9**

forensic interviewer's testimony is particularly problematic, because it does not appear that the trial court made the categorical evidentiary ruling Pardee claims it did. Although Pardee claims that the trial court prevented him from making *any* use of the forensic interview recording in cross-examination of the forensic interviewer or Victim, it appears that the trial court was willing to permit Pardee to cross-examine the forensic interviewer about specific interview questions that Pardee claimed were leading. Despite the court's request that Pardee identify the purportedly leading questions, Pardee failed to do so. In addition, it appears that the trial court was willing to permit Pardee to cross-examine the Victim concerning inconsistencies within the forensic interview, or between the forensic interview and the Victim's trial testimony, but Pardee never attempted to do so. Because Pardee did not adequately preserve his claim for appellate review, this court may only review it, if at all, for plain error. *Michaud*, 600 S.W.3d at 762.

Generally, an appellate court does not review unpreserved claims of error. *State v. Brandolese*, 601 S.W.3d 519, 525-26 (Mo. banc 2020). Rule 30.20, however, provides an appellate court discretion to review "plain errors affecting substantial rights…when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Plain error review is discretionary, and [an appellate court] will not review a claim for plain error unless the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Brandolese*, 601 S.W.3d at 526 (internal quotes and citations omitted). "The plain error rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise

**10**

preserved for appellate review." *Id.* (internal quotes and citation omitted).

Pardee has failed to demonstrate facially substantial grounds for believing that the trial court's refusal to allow him to play Victim's forensic interview prior to or while cross-examining the forensic interviewer and Victim so that he could question them about the contents of the video resulted in manifest injustice or miscarriage of justice. Review of the forensic interview reveals that Victim's statements regarding the touching of Victim's breast and of Pardee's penis were not inconsistent during the interview. It also reveals that the interviewer did not ask leading questions to prompt Victim to make those disclosures.

During the interview, after first building rapport with Victim for about 10 minutes, the interviewer said, "Tell me what you are here to talk to me about today." Victim talked continuously, without interruption by the interviewer, for almost 30 minutes, describing what had happened from the time Pardee entered her bedroom until she talked to her teacher and then counselor at school the next day. During this long narrative, she only briefly (approximately one and a half minutes) recounted the sexual contact Pardee subjected her to. She said that he started touching her "inappropriately," and she vaguely described Pardee pulling the blanket off her, touching her leg and going further "up," and then trying to go up her shirt before she pulled back and put the blanket back over herself. She said that Pardee then "unzipped his pants and made [her] touch him."

When Victim was done with her account, the interviewer asked her to tell her exactly what Pardee did when he touched her inappropriately. At this point,

**11**

approximately 40 minutes into the interview, Victim began describing more details of the sexual contact. She said that Pardee started rubbing the outside and inside of her leg, demonstrating with her hand on her leg. She continued, "and then he would start doing that," demonstrating touching her vaginal area and then her right breast with her hand. She said, "he would go back down and he would do it right here for a little bit," again pointing to her vaginal area. Victim then said, "he tried to go up my shirt but he only got up here," pointing to her stomach, before she pulled away. She said he unzipped his pants and "made me touch him inappropriately." She said, "he was telling me to grab it," "he said for me to squeeze it," and "I don't really know what it means but he told me to stroke it." The interviewer told Victim that she had two drawings of people without clothing to help her understand exactly what she was telling her, and she asked Victim to circle on the drawings all of the places Pardee had touched her and where he made her touch him. Victim circled the right breast, vagina, the right thigh, and hair on the female drawing and the penis on the male drawing.

The interviewer then asked Victim for further details about each touching she reported. She first asked Victim what Pardee touched her thigh with and whether it was on top of her clothing or under it. Victim responded that he used his hand on top of her clothing. She said the only time Pardee tried to go under her clothing was when he tried to go up her shirt and she pulled away. Next, the interviewer asked Victim what Pardee used to touch her vagina, how he touched her vagina, and whether it was on top or underneath of her clothing. Victim responded that he used his hand, rubbing her vagina

back and forth, over her clothing.  The interviewer then asked Victim to tell her about how Pardee tried to go up under her shirt.  Victim demonstrated how Pardee put his hand under her shirt and said that he "tried to reach for [her] boob" but he only got as far as her stomach when she scooted away from him.  The interviewer next asked about when Pardee touched her breast.  She asked what Pardee used to touch her breast, whether the touching was on top or underneath her clothing, and how he touched her.  Victim responded that Pardee used his hand to touch her breast on top of the clothing.  She said he squeezed it, and she demonstrated rubbing her hand over her breast.  The interviewer asked Victim if Pardee used anything other than his hand to touch the parts of her body that she had identified or if he had touched any other part of her body, and Victim answered no.  The interviewer then asked about when Pardee made Victim touch his penis.  She asked Victim what Pardee made her use to touch him, whether he was sitting or standing, and whether he was wearing underwear under his pants.  Victim said that Pardee grabbed her hand and told her to grab and stroke his penis.  She demonstrated Pardee holding her wrist and making her hand move on his penis.  She said that he was standing up at the time and that she could not remember if he had underwear on under his pants.

Although ten-year-old Victim was initially vague in reporting the various touching by Pardee, when asked by the interviewer with non-leading questions to provide more details, Victim remained consistent in her disclosures throughout the interview.  And though Victim may have made some inconsistent statements regarding certain details

**13**

during the forensic interview,[4] her statements that went directly to the elements of the offenses were definite and unchanging.

Moreover, Pardee had an opportunity to present a defense regarding the interview. Both the interviewer and Victim were present, testified, and were cross-examined at trial. Defense counsel acknowledged during closing argument that he had watched the interview "multiple times" and actually referenced specific times during the interview; however, he did not cross-examine the interviewer or Victim about any leading questions or inconsistent statements. Furthermore, after the State published the interview at the end of its case, defense counsel did not recall the interviewer or Victim during the defense's case to question them about leading questions or inconsistent statements during the interview. Pardee admits in his brief that "the video was played and the defense pointed out these problems [with the interview]." The State played the interview for the jury at the end of the State's case, and defense counsel commented on the interviewer's questions and Victim's statements extensively during closing argument.

Given that the interviewer asked only non-leading questions, that Victim's statements about the sexual contact were consistent during the forensic interview, and that Pardee was able to present a defense about the interview, the trial court's refusal to allow Pardee to cross-examine the interviewer and Victim with the videotaped interview

---

[4] During the interview Victim was not entirely consistent regarding when Pardee told her she could not tell anyone what had happened, whether he was wearing jeans or sweatpants, and whether she was lying down or sitting up.

did not facially establish substantial grounds for believing that manifest injustice or a miscarriage of justice resulted. We exercise our discretion to decline plain error review of this point.

Point one is denied.

## Point Two

In his second point on appeal, Pardee contends that the trial court erred in entering a conviction and sentence against him for second-degree child molestation. He argues that there was insufficient evidence that he touched Victim's breast.

Appellate review of the sufficiency of the evidence to support a criminal conviction is limited to determining whether there is sufficient evidence from which any rational finder of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Phillips*, 687 S.W.3d 642, 650 (Mo. banc 2024). A person commits the offense of second-degree child molestation if he "[s]ubjects a child who is less than twelve years of age to sexual contact." § 566.068.1(1), RSMo 2016. Sexual contact is defined as "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, or such touching through the clothing, for the purpose of arousing or gratifying the sexual desire of any person[.]" § 566.010(6), RSMo 2016.

During her forensic interview, which was played for the jury, Victim told the interviewer that, after Pardee pulled the blanket off of her and touched her thigh and her vagina over her clothing, he touched and squeezed her right breast over her clothing with

**15**

his hand. Pardee then tried to put his hand up her shirt but did not get above her stomach because Victim pulled away from him and put the blanket back over herself. At trial, the State did not ask Victim about any specific touching on direct examination. On cross-examination, the following exchange occurred:

Q: Okay. Did he try to touch your chest?

A: Yeah.

Q: Okay. And would it be fair to say that he tried to touch your chest, and then you pulled away?

A: Yeah.

Q: And his hand didn't actually touch your breast at that time, right?

A: Yeah.

Q: I'm sorry. That was a bad question. When you say yeah, do you mean that his hand did or didn't actually touch your chest?

A: Didn't.

Pardee argues that Victim's trial testimony was consistent with her statements in the forensic interview that Pardee never touched her breast. He asserts that no reasonable juror would credit, and this court should not credit, Victim's other statements during the forensic interview that Pardee touched her breast on top of her clothing because they were so contrary to all of the other evidence presented on the issue.[5]

---

[5] Although Pardee does not reference the Corroboration Rule and Destructive Contradictions Doctrine, to the extent that his argument relies on them, such argument is without merit. The Missouri Supreme Court abolished both in *State v. Porter*, 439 S.W.3d 208, 211-13 (Mo. banc 2014). *State v. Dodd*, 637 S.W.3d 659, 667 (Mo. App. W.D. 2021). Pardee also argues that this

An appellate court does not reweigh the evidence but, instead, accepts as true all evidence and inferences supporting guilt and ignores all contrary evidence and inferences. *State v. Dodd*, 637 S.W.3d 659, 668 (Mo. App. W.D. 2021). The trier of fact may believe all, some, or none of a witness's testimony when considered with the facts, circumstances, and other testimony in the case. *Id.* "The testimony of a single witness is sufficient to support a conviction even if the testimony of the witness is inconsistent." *Id.* (internal quotes and citation omitted). "The jury is in the best position to resolve credibility issues, such as inconsistencies in the victim's trial testimony and out-of-court statements." *Id.* The appellate court will not engage in credibility determinations that are properly left to the trier of fact. *Id.*

Contrary to Pardee's argument, Victim's out-of-court statements during the forensic interview and her trial testimony were consistent. During her forensic interview, she reported two different instances where Pardee tried to touch her breast. In one instance, she said that Pardee touched and squeezed her breast over her clothing, in another, he tried to put his hand up her shirt but she pulled away before he could touch her breast. At trial, Victim testified only about the instance where Pardee tried to put his hand up her shirt. She was not asked, and did not testify, about when he touched her

---

court should not credit Victim's statements at the forensic interview that he touched her breast on top of her clothing because he was not able to cross-examine her about the inconsistency given the trial court's ruling, which was the subject in point one. As discussed above, Victim's statements regarding Pardee touching her right breast on top of her clothing and his other attempt to touch her breast under her clothing were consistent throughout her interview, and, accordingly, Pardee failed to establish grounds for believing that manifest injustice or a miscarriage of justice resulted warranting plain error review.

right breast on top of her clothing.  Even if her out-of-court statements and trial testimony were inconsistent, the inconsistency was for the jury to resolve.  The jury could have believed Victim's report to the interviewer that Pardee touched her right breast over her clothing.  The evidence supports Pardee's conviction for second-degree child molestation for touching Victim's breast.

Point two is denied.

## Correction of Written Judgment

As a final matter, the State notes that the trial court orally pronounced a sentence of life imprisonment for first-degree statutory sodomy but that the court's written judgment imposes a sentence of 999 years for the conviction.[6]  "[T]he written sentence and judgment of the trial court should reflect its oral pronouncement of sentence before the defendant."  *State ex rel. Zinna v. Steele*, 301 S.W.3d 510, 514 (Mo. banc 2010) (internal quotes and citation omitted).  "[I]f a material difference exists between the

---

[6] We note that in other cases raising a similar claim of failure to memorialize the pronounced sentence, the claim is decided either under plain error review, *State v. Pierce*, 678 S.W.3d 115, 124-25 (Mo. App. S.D. 2023); *State v. Clark*, 494 S.W.3d 8, 14 (Mo. App. E.D. 2016), or based on a court's authority to correct clerical mistakes under Rule 29.12(c), *State v. Davie*, 638 S.W.3d 514, 524 (Mo. App. W.D. 2021); *State v. Fewins*, 638 S.W.3d 36, 38-39 (Mo. App. S.D. 2021); *State v. Johnson*, 456 S.W.3d 497, 505 (Mo. App. E.D. 2015).  *State v. Denham*, 686 S.W.3d 357, 369 n.3 (Mo. App. W.D. 2024).  Rule 30.20 provides, "Whether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."  "An unauthorized sentence affects substantial rights and results in manifest injustice."  *Denham*, 686 S.W.3d at 369 n.3 (internal quotes and citation omitted).  Rule 29.12(c) provides, in pertinent part, "Clerical mistakes in judgments…arising from oversight or omission may be corrected by the court at any time after such notice, if any, as the court orders."  Regardless, all of the noted cases resolve the issue consistently.

written judgment and oral pronouncement, the oral pronouncement controls." *Id.* (internal quotes and citation omitted). "The failure to accurately memorialize the decision of the trial court as it was announced in open court is a clerical mistake." *State v. Denham*, 686 S.W.3d 357, 369 (Mo. App. W.D. 2024) (citing *State v. Davie*, 638 S.W.3d 514, 524 (Mo. App. W.D. 2021)). "Clerical errors in the sentence and judgment in a criminal case may be corrected by order nunc pro tunc if the written judgment does not reflect what was actually done." *Id.* (quoting *Davie*, 638 S.W.3d at 524).

At sentencing, the trial court pronounced a sentence of life imprisonment for first-degree statutory sodomy. The trial court's written judgment, however, indicates that the sentence for first-degree statutory sodomy is 999 years. The authorized sentence for first-degree statutory sodomy in this case, where the victim is less than twelve years old, is life imprisonment or a term of years not less than ten years. § 566.062.2(1), RSMo 2016. Sentences of life and 999 years are materially different because, among other things, they have a different effect in determining parole eligibility dates. *State v. Fewins*, 638 S.W.3d 36, 38 (Mo. App. S.D. 2021); *State v. Clark*, 494 S.W.3d 8, 14 (Mo. App. E.D. 2016); § 558.019.4, RSMo Cum. Supp. 2019 (for purposes of determining the minimum prison term to be served, a sentence of life is calculated to be 30 years and a sentence over 75 years is calculated to be 75 years). Because the written judgment does not conform to the trial court's oral pronouncement of sentence, it contains clerical errors that may be corrected nunc pro tunc. *Denham*, 686 S.W.3d at 371; *Davie*, 638 S.W.3d at 524. The case is remanded to the trial court to enter a corrected judgment that conforms to the

**19**

trial court's oral pronouncement of sentence for first-degree statutory sodomy.

## Conclusion

The case is remanded to the trial court for entry of a corrected written judgment that conforms to the trial court's oral pronouncement of sentence for first-degree statutory sodomy.  In all other respects, the judgment is affirmed.

_____
Thomas N. Chapman, Judge

All concur.